Scott R. Raber (SBN 194924)
RIMON P.C.
One Embarcadero Center, Suite 400
San Francisco, CA 94111
Phone: (415) 683-5472
Facsimile: (800) 930-7271
Email: scott.raber@rimonlaw.com

Alexandra Wald (*admitted pro hac vice*)
awald@cohengresser.com
Francisco A. Villegas (SBN 206997)
fvillegas@cohengresser.com
Damir Cefo (*admitted pro hac vice*)
dcefo@cohengresser.com
Erik Hanson (*admitted pro hac vice)*
ehanson@cohengresser.com
COHEN & GRESSER LLP
800 Third Avenue, 21st Floor
New York, NY 10022
Phone: 212.957.7600
Facsimile: 212.957.4514

Attorneys for Plaintiff
EMBLAZE LTD.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| EMBLAZE LTD., Plaintiff, v. MICROSOFT CORPORATION, Defendant. | Case No. 3:12-cv-5422-JST **EMBLAZE LTD.'S OPENING CLAIM CONSTRUCTION BRIEF** |

# TABLE OF CONTENTS

Page

I. THE '473 PATENT ..... 1

II. MICROSOFT'S TECHNOLOGY AND NON-INFRINGEMENT POSITION ..... 1

III. THE LAW OF CLAIM CONSTRUCTION ..... 1

1. Methodology ..... 1

2. Extrinsic evidence ..... 2

3. Canons of Construction ..... 3

IV. ARGUMENT ..... 5

A. "File(s)" and "sequence of files, each file having a respective index" ..... 6

1. Term 1: "file / files" ..... 6

2. Term 10: "sequence of files, each file having a respective index" ..... 8

B. "Data rate," ". . . given data rate," and "providing at. . ., " ". . . data size," "dividing. . . into time slices," "uploading. . ." and "downloading. . ." ..... 10

1. Term 2: "data rate" ..... 10

2. Term 3: "a data stream having a given data rate" ..... 11

3. Term 4: "providing at the transmitting computer a data stream [having a given data rate]" ..... 14

4. Term 5: "each slice having a predetermined data size associated therewith" ..... 15

5. Term 6: "wherein dividing the stream into the sequence of slices comprises dividing the stream into a sequence of time slices, each having a predetermined duration associated therewith" and "wherein the predetermined data size of each of the slices corresponds to a time duration of the slice" ..... 17

6. Term 11: "uploading the sequence to a server at an upload rate generally equal to the data rate of the stream" and "uploads the sequence to a server at an upload rate generally equal to the data rate" ..... 18

7. Term 13: "such that the one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate" ..... 20

C. "Encoding the slices," "quality levels," and "decode the sequence" ................21

1. Term 7: "encoding the slices in a corresponding sequence of files" and "encodes the slices in a corresponding sequence of files" ................21

2. Term 8: "encoding slices at a plurality of different quality levels" and "slices are encoded at a plurality of different quality levels" ........23

3. Term 9: "decode the sequence" ................23

D. Remaining Terms for Construction ................24

1. Term 14: "play back the data stream responsive to the indices of the files" and "play back the data stream responsive to the indices thereof" ................24

2. Term 15: "at a replay rate generally equal to the data rate" and "at a data replay rate generally equal to the data rate" ................24

3. Term 16: "uploading and updating an index file containing the index of the file in the sequence that was most recently uploaded" ......24

4. Term 17: "determining a data bandwidth of the network between the server and the client computer" ................24

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298 .......... 3

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336 (Fed. Cir. 2001) .......... 3

*CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146 (Fed. Cir. 1997) .......... 2

*Dow Chemical Co. v. Sumitomo Chemical Co., Ltd.*, 257 F.3d 1364 (Fed. Cir. 2001) .......... 19

*Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358 (Fed. Cir. 2001) .......... 3

*Elkay Manufacturing Co. v. Ebco Manufacturing Co.*, 192 F.3d 973 (Fed. Cir. 1999) .......... 4

*EON Corp. IP Holdings LLC v. Aruba Networks Inc.*, 2013 WL 3455631 (N.D. Cal. July 8, 2013) .......... 5

*Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495 (Fed. Cir. 1997) .......... 3

*Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367 (Fed. Cir. 2005) .......... 3

*Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327 (Fed. Cir. 2004) .......... 2, 22

*In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303 (Fed. Cir. 2011) .......... 9, 19

*Intermatic Inc. v. Lamson & Sessions Co.*, 273 F.3d 1355 (Fed. Cir. 2001) .......... 4

*KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351 (Fed. Cir. 2002) .......... 3

*KX Indus., L.P. v. PUR Water Purification Products, Inc.*, 108 F. Supp. 2d 380 (D. Del. 2000) .......... 22

*Laitram Corp. v. Cambridge Wire Cloth Co.*, 863 F.2d 855 (Fed. Cir. 1988) .......... 9

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) ....................2

*Markman v. Westview Instrs., Inc.*,
52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996) ....................passim

*McCarty v. Lehigh Val R.R.*,
160 U.S. 110, 16 S.Ct. 240 (1895) ....................7

*Merck & Co. v. Teva Pharm. USA, Inc.*,
395 F.3d 1364 (Fed. Cir. 2005) ....................15

*Microprocessor Enhancement Corp. v. Texas Instruments Inc.*,
520 F.3d 1367 (Fed. Cir. 2008) ....................4

*N. Telecom Ltd. v. Samsung Elecs. Co.*,
215 F.3d 1281 (Fed. Cir. 2000) ....................10

*Netcraft Corp. v. eBay, Inc.*,
549 F.3d 1394 (Fed. Cir. 2008) ....................3

*North Am. Vaccine, Inc. v. American Cyanamid Co.*,
7 F.3d 1571 (Fed. Cir. 1993) ....................3

*Novartis Pharm. Corp. v. Abbott Labs.*,
375 F.3d 1328 (Fed. Cir. 2004) ....................2

*O2 Micro Int'l. Ltd. v. Beyond Innovation Technology Co., Ltd.*,
521 F.3d 1351 (Fed. Cir. 2008) ....................25

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ....................passim

*Pressure Products Medical Supplies, Inc. v. Greatbatch Ltd.*,
599 F.3d 1308 (Fed. Cir. 2010) ....................25

*Rapoport v. Dement*,
254 F.3d 1053 (Fed. Cir. 2001) ....................1, 2

*Renishaw PLC v. Marposs Societa' Per Azioni*,
158 F.3d 1243 (Fed. Cir. 1998) ....................2, 7

*RF Del., Inc. v. Pac. Keystone Techs., Inc.*,
326 F.3d 1255 (Fed. Cir. 2003) ....................13

*Samsung Elecs. Co. Ltd. v. Tessera Techs, Inc.*,
2004 WL 5644704 (N.D. Cal. Jan. 8, 2004) ....................5, 11

*Sandisk Corp. v. Memorex Products, Inc.*,
415 F.3d 1278 (Fed. Cir. 2005) ....................4

*Sears Petroleum & Transport Corp. v. Archer Daniels Midland Co.*, 2007 WL 2156251 (N.D.N.Y. July 24, 2007) ....................22

*SRI Int'l. v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107 (Fed.Cir. 1985) ....................5

*Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313 (Fed. Cir. 2002) ....................2

*Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295 (Fed. Cir. 1999) ....................9

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) ....................1, 19

Pursuant to Patent L.R. 4-5 and the Second Joint Case Management Statement (D.E. #34), Plaintiff Emblaze Ltd. ("Emblaze") submits this opening brief in support of its proposed construction of the disputed claim terms of U.S. Patent No. 6,389,473 (hereinafter, "the '473 Patent").

## I. THE '473 PATENT

The '473 Patent issued on May 14, 2002 and is directed to methods and systems for real-time broadcasting over a network, such as the Internet. Real-time broadcasting is accomplished by dividing a provided stream into slices of predetermined data sizes and encoding them into files that are uploaded to a server for download by one or more clients. The upload and download rates are generally equal to the provided stream's data rate. In some embodiments, a client may select different quality levels over the course of the download, depending on available bandwidth.

## II. MICROSOFT'S TECHNOLOGY AND NON-INFRINGEMENT POSITION

Microsoft's Smooth Streaming technology enables the real-time streaming of multimedia broadcasts by creating fragmented MP4 files that can be downloaded by consumers. Microsoft's claim construction strategy revolves around the following core non-infringement positions: (1) multimedia fragments, containing metadata and data within a fragmented MP4 file, are not "files;" (2) uploading and downloading rates are different from the stream's "data rate" because different upload and download bandwidths may allow moments of "dead time" during real-time broadcast; and (3) "encoding the slices" must involve "compression" of each individual slice. All of these arguments (except those for "file") were already addressed and rejected in the related case of *Emblaze Ltd. v. Apple Inc.*, Case No. 11-1079 PSG (the "*Apple* Case").

## III. THE LAW OF CLAIM CONSTRUCTION

### 1. Methodology

Claim construction is a question of law[1], and begins with the language of the claims. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Rapoport v.*

---

[1] *See Markman v. Westview Instrs., Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).

*Dement*, 254 F.3d 1053, 1059 (Fed. Cir. 2001) (the court turns first to the claims themselves to determine the scope of what is claimed).[2]

"[C]laim terms take on their ordinary and accustomed meanings unless the patentee demonstrated an intent to deviate [therefrom]. . . by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002). "We indulge a 'heavy presumption' that a claim term carries its ordinary and customary meaning." *Id.* at 1325.

While claims are construed "in light of the specification, limitations [therefrom]. . . are not to be read into the claims. *See Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1331 (Fed. Cir. 2004) ("it is the claims that measure the invention.") (internal quotation marks and citations omitted). Thus, claims generally are not limited to specific embodiments set forth in the specification. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (*en banc*).

"Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004). The Federal Circuit "has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Id.*

**2. Extrinsic evidence**

Extrinsic evidence should not be considered when an analysis of the intrinsic evidence alone resolves any ambiguity in a disputed claim term. *See CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1153 (Fed. Cir. 1997). If extrinsic evidence must be considered, it "may be used by the court to help understand the disputed limitation, [however] it may not be used to vary, contradict, expand, or limit the claim language from how it is defined, even by implication, in the specification or file history." *Novartis Pharm. Corp. v. Abbott Labs.*, 375

[2] "[T]he claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998).

F.3d 1328, 1334 (Fed. Cir. 2004). Such evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Netcraft Corp. v. eBay, Inc.*, 549 F.3d 1394, 1397 (Fed. Cir. 2008) (citation omitted); see *Phillips*, 415 F.3d at 1318, 1324.

**3. Canons of Construction**

**a. Words of approximation**

The Federal Circuit has held that words of approximation are "descriptive terms commonly used in patent claims to avoid a strict numerical boundary to the specified parameter." *Anchor Wall Systems, Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1310-11 (internal quotations omitted) ("'generally parallel' envisions some amount of deviation from exactly parallel."); *see also Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1369 (Fed. Cir. 2001) ("'substantially uniform' as related to the 'alkaline detergent cast' means what it says, 'largely, but not wholly the same in form.'"). Words of approximation such as "substantially" and "generally" are "ubiquitously used in patent claims and . . . such usages, . . . have been accepted in patent examination and upheld by the courts." *Anchor Wall Systems, Inc.*, 340 F.3d at 1311 (Fed. Cir. 2003) (citations omitted).

**b. "Comprising"**

"Comprising" is a term of art and means that "the named elements are essential, but other elements may be added, and still form a construct within the scope of the claim." *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997). "The word 'comprising' transitioning from the preamble to the body [of the claim] signals that the entire claim is presumptively open-ended." *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1371 (Fed. Cir. 2005) ("[T]he transition 'comprising' creates a presumption that the recited elements are only a part of the device, that the claim does not exclude additional, unrecited elements.").[3]

**c. "A" means one or more**

When a claim includes the open-ended transitional word "comprising," "a" is generally understood to mean "one or more." *North Am. Vaccine, Inc. v. American Cyanamid Co.*, 7

[3] *See also Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001), *citing KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2002).

F.3d 1571, 1575-76 (Fed. Cir. 1993) ("an article ['a'] can carry the meaning of 'one or more,' for example in a claim using the transitional phrase 'comprising.'").[4]

**d. Multiple appearances of same term in a claim**

A term in a patent claim may be first referred to as "a," which provides an "antecedent basis" for the term. Essentially, the patentee provides an initial, threshold definition of the term. Thereafter, the term may be referred to by reference to its antecedent basis, such as, "the . . ." or "said . . ." *See Sandisk Corp. v. Memorex Products, Inc.*, 415 F.3d 1278, 1284-5 (Fed. Cir. 2005). Where a term is referred to in that fashion, however, the law does not require that the term be construed identically to the antecedent in all instances. The meaning may vary depending on context. *See Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008) (The "patentee's mere use of a term with an antecedent does not require that both terms have the same meaning"); *id.* at 1376 (differentiating term "condition code" as used in two different claims, because the two uses were "not surrounded by uniform language that requires a single interpretation of the term").[5]

**e. Claim differentiation**

The doctrine of claim differentiation assumes that two claims in the same patent will not have an identical scope and should be construed to give effect to the difference in scope indicated by a difference in language. *Intermatic Inc. v. Lamson & Sessions Co.*, 273 F.3d 1355, 1364 (Fed. Cir. 2001). "Differences among claims can . . . be a useful guide in understanding the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. "For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-1315.

---

[4] *Elkay Manufacturing Co. v. Ebco Manufacturing Co.*, 192 F.3d 973, 977 (Fed. Cir. 1999) ("[w]hile the article 'a' or 'an' may suggest 'one,' our cases emphasize that 'a' or 'an' can mean 'one' or 'more than one,' depending on the context in which the article is used.").

[5] *See also Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1031 (Fed. Cir. 2002) (construing "substantially" as having two different meanings based on its use in "two contexts with a subtle but significant difference").

**f. Consideration of accused products is limited only to the extent necessary to understand the parties' dispute**

If a court cannot understand the differences between the parties' proposed constructions without reference to the accused products, the court may take note of the accused products to the limited extent necessary to clarify where the parties differ. *See EON Corp. IP Holdings LLC v. Aruba Networks Inc.*, 2013 WL 3455631 at *8 (N.D. Cal. July 8, 2013). In no event, however, should accused products be used as evidence to construe the claims. *Id.* Claim construction is a judgment of claim scope, not an infringement determination, and the Court's determination on construction should not go so far as to obviate factual questions of infringement and validity. *Id.* at *7.

## IV. ARGUMENT

Emblaze relies on constructions already adopted within this District. While those constructions are not binding on this Court, they should be adopted here in the interest of intra-jurisdictional uniformity. *Samsung Elecs. Co. Ltd. v. Tessera Techs, Inc*., 2004 WL 5644704 at *4 (N.D. Cal. Jan. 8, 2004) ("*Markman* urges the application of a given court's previous claim construction to a new and independent infringement defendant in the interest of 'intrajurisdictional uniformity.'") (citations omitted). In addition, as to those terms that have not yet been construed, Emblaze proposes constructions that are supported by the intrinsic record and are consistent with their ordinary meaning.

In contrast, Microsoft's constructions stretch the patent record for purposes of non-infringement by repeatedly loading the claim terms with extraneous detail, at best improperly incorporating preferred embodiments disclosed in the written description, and at worst, plucking terms from dictionaries where even a creative reading of the patent specification cannot support Defendant's constructions. Such tactics are incompatible with settled law. *See Markman v. Westview Instrs., Inc.*, 52 F.3d 967, 980 (Fed.Cir. 1995) (*en banc), aff'd,* 517 U.S. 370 (1996) ("The written description part of the specification does not delimit the right to exclude. That is the function and purpose of the claims."); *SRI Int'l. v. Matsushita Elec. Corp.*

*of Am.*, 775 F.2d 1107, 1121 n.14 (Fed.Cir. 1985) (*en banc*) ("Specifications teach. Claims claim.").[6]

The disputed claim terms in this brief are identified by Term number as they appear in the Joint Claim Construction and Prehearing Statement (D.E. #46). Villegas Decl., Ex. A ("JCCPS"). For ease of discussion, these terms have been grouped by related concepts.

### A. "File(s)" and "sequence of files, each file having a respective index"

This section implicates three concepts, the meaning of "file," "sequence of files," and the "index" associated with a "file." *See*, JCCPS, Terms 1 and 10.

#### 1. Term 1: "file / files"

| Emblaze's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| Does not Need a Construction. In the alternative, should be construed as "a slice of data that has a file descriptor" | "a collection of data stored in a directory and accessed by a file name for accessing, editing, and saving |

Emblaze proposes that "file(s)" should be construed according to its plain and ordinary meaning. This interpretation was largely implicitly adopted in the *Apple* Case within the larger phrase, "encoding the slices in a corresponding sequence of files,"[7] to mean "a slice (segment) of data that has a file descriptor."

[6] *Phillips*, 415 F.3d at 1323 ([A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.").

[7] This larger phrase was construed by Judge Grewal to mean "forming each slice as a file, wherein a file includes compressed data from the slice and a file descriptor, and wherein the sequence of files corresponds to the sequence of slices." Villegas Decl., Ex. C, Claim Construction Order (D.E. #169) (hereinafter, the "Apple Claim Construction Order"). Emblaze's proposed definition does not contain the language "includes compressed data from the slice" because a "file" when construed outside of the context of the surrounding words in the claim, has a more general meaning of a "segment of data with a file descriptor." The content of this general "segment of data" envelope may include *e.g.*, compressed data, uncompressed data, metadata, etc. This general meaning is contemplated by the patent specification (*e.g.*, [p]referably, the data in the sequence are compressed, although compression is not essential to implementation of the present invention"). The "compressed data from the slice" limitation stems from the surrounding words in (a) the larger construed phrase and (b) the preceding phrase in the claim ("providing at the transmitting computer. . ."). This is evidenced by Emblaze's proposed construction of "encoding the slices. . .," which specifically includes this limitation.

The '473 Patent specification makes clear that "file" includes "a slice of data."[8] For example, in a preferred embodiment, "each *segment* or *slice* is contained in a separate, respective file." '473 Patent (Villegas Decl., Ex. B), 2:22-24 (emphasis added). *See also* 8:42-46 ("FIG. 3D . . . schematically illustrates a file format of a multi-level data stream 41 . . . divided into audio slices 45, 47 and video slices 49, 51."). For these reasons, a file includes a segment of data.

A "file" further includes a "file descriptor," which can be of different types. Some exemplary descriptors include: (1) a "name" ("Preferably, ID 52 holds the file name of the new file") 7:66 – 8:1; (2) a "level identifier" ("Each slice [formed as a file] is preferably identified by a level identifier 57 . . . and, as appropriate, a size identifier") 8:47-50; or (3) a "size identifier." *Id*.

Microsoft, in contrast, contorts the meaning of "file" to require that it be: (a) stored in a directory; (b) accessed by a file name; and (c) (explicitly) for accessing, editing, and saving. Had the patentee intended such an elaborate definition of "file," one would expect each of these three requirements to be clearly described in the claim language and supported by the patent specification's description. Tellingly, not one of these limitations is found in the claim language itself or the specification. For example, the specification never states that a "file" must be stored in a directory.[9] Nor does it mandate that files be "named,"[10] or accessed by a

---

[8] The '473 Patent associates "files" with corresponding "slices." *See* '473 Patent, 7:23-28; 8:56-57; 9:66 - 10:1; 10:46-49; 11:55-56; 11:67 - 12:5; 12:24-25; and 12:36-46.

[9] The specification mentions the term "directory" only once, in the context of a particular exemplary software appended to the patent. *See* '473 Patent, 14:9-11. There is no mention of a "directory" as a basic or defining characteristic of the "file" as claimed in the '473 Patent.

[10] Microsoft's proposed construction seeks to limit this descriptor to a "name" (and to add further requirements). However, a name is merely one example of a permissible descriptor ("Preferably, ID 52 holds the file name of the new file, wherein the name typically comprises a string followed by the index of the file"). '473 Patent, 7:66-8:1. Importing such a limitation into the claim language is impermissible. *Renishaw PLC v. Marposs Societa' Per Azioni,* 158 F.3d 1243, 1248-1249 (Fed. Cir. 1998), *citing McCarty v. Lehigh Val R.R.,* 160 U.S. 110, 116, 16 S.Ct. 240 (1895). ("[W]e know of no principle of law which would authorize us to read into a claim an element which is not present . . . The difficulty is that if we once begin to include elements not mentioned in the claim in order to limit such claim . . ., we should never know where to stop.").

"file name." The specification similarly lacks Microsoft's list of the intended purpose for a file, much less that it be for "accessing, editing and saving."

Even Microsoft's cited extrinsic evidence fails to support its construction for at least four reasons. *First*, Microsoft's extrinsic evidence omits any mention of a "directory." Villegas Decl., Ex. D (Microsoft Computer Dictionary, Fifth Ed.), at 211. *Second*, none of Microsoft's dictionary definitions require that a file be accessed by a file name.[11] *Id*. *Third*, *two* of its three dictionary definitions fail to reference "a named collection of information." *Id*. *Fourth*, two of its three dictionary definitions do not have any qualifications as to purpose, and as for the third definition, Microsoft used only some of the listed qualifications, but omitted others – *e.g.*, Microsoft left out "delete," or "send to an output device," etc.

Microsoft's inclusion of (a) extraneous limitations not present in the intrinsic record or even in its extrinsic evidence (*e.g.*, directory and accessed by a file name), and (b) cherry-picked portions of dictionary definitions, evidences that its proposed constructions are tailored purely for litigation and should not be adopted.

**2. Term 10: "sequence of files, each file having a respective index"**

| **Emblaze's Proposed Construction** | **Microsoft's Proposed Construction** |
|---|---|
| "sequence of files, wherein each file has an indicator that represents a respective slice's location in the sequence" | "sequence of files, wherein each file has an index from a running slice index 1, 2, 3, . . . N indicating its location in the sequence." |

Both parties agree that this term involves a sequence of files, and that each file has an index (indicator) that represents the slice location in the sequence.[12] Yet, Microsoft

[11] This is not surprising, because along with lacking support in the claims or specification, Microsoft's proposed construction is also vague. What does it mean for a file name to be "accessed by a file name for accessing?" And if a file must be accessed by a file name to have any access in the first instance, why specify that it must be accessed by a file name "for saving and editing"?

[12] The intrinsic record supports that each file has an index (indicator) that represents the location in the sequence. *See* '473 Patent, 7:59-64 ("FIG. 3B is a block diagram that schematically illustrates an index file 50. . . The index file comprises a slice ID 52, indicating the index of the file in data stream 40 that was most recently uploaded by computer 34"); 7:66-8:1 ("Preferably, ID 52 holds the file name of the new file, wherein the name typically comprises a string followed by the index of the file."); and, 8:1-5 ("When one of computers 30 connects to server 36 and begins to download the data stream, it first reads the index file in

impermissibly proposes to further narrow the construction by suggesting that the "index" must be "from a running slice index 1,2,3. . ." *i.e.*, a particular type from one preferred embodiment ('473 Patent, 7:27-28). Microsoft's proposal, however, would *exclude* another exemplary type of "index" (a presentation time stamp (PTS) index) that is specifically described in the patent: "[e]ach slice is preferably identified by . . . *a presentation time stamp (PTS) index* 59 . . ." (8:47-50, emphasis added.). An interpretation that excludes an embodiment, however, is improper. *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1324 (Fed. Cir. 2011) ("[T]here is a strong presumption against a claim construction that excludes a disclosed embodiment . . ."). Thus, the word "index" in the claims cannot be the same as a "running slice index 1, 2, 3 . . . N" as Microsoft proposes. *See Laitram Corp. v. Cambridge Wire Cloth Co.,* 863 F.2d 855, 865 (Fed. Cir. 1988) ("References to a preferred embodiment, such as those often present in a specification, are not claim limitations."); *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1301 (Fed. Cir. 1999) ("It is well established that the preferred embodiment does not limit broader claims that are supported by the written description.").

Emblaze's construction, on the other hand, recognizes that the claims repeatedly use the term "index" without restricting it to a specific type of index. It also accords with the fact that the intrinsic record identifies at least two distinct exemplary types of indices: (a) a presentation time stamp (PTS) index; and (b) a "running slice index 1, 2, 3. . . N." Not only are these indices referred to separately, they permit at least two different ways of indexing data: by slice order, on the one hand, and by position in time, as another. Thus, an index should not be limited to only one type and should mean "an indicator that represents a respective slice's location in the sequence," as adopted in the *Apple* Case within a larger phrase, Apple Claim Construction Order, at 2.

---

order to identify at what point in stream 40 to being and to start receiving the data stream substantially in real time . . .").

**B. "Data rate," ". . . given data rate," and "providing at. . ., " ". . . data size," "dividing. . . into time slices," "uploading. . ." and "downloading. . ."**

A number of disputed claims in this case involve the concepts of a "data rate"/ "data size," "uploading" and "downloading," and what it means for different rates to be "generally equal." *See* JCCPS, Terms 2-6, 11 and 13.

**1. Term 2: "data rate"**

| Emblaze's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| "an amount of data per unit of time" | "an amount of data (i.e., number of bits) per unit of time" |

The parties agree that this term involves an "amount of data" per unit of time. Emblaze's construction ends there, and replicates the construction adopted in the *Apple* Case.[13]

Microsoft, however, proposes to further limit the broad term "amount of data" to mean only "number of bits" (and consequently, to limit a "data rate" to mean a "bit rate"). This proposed limitation lacks any support in the plain text of the claims. If the patentees had wanted to limit "data rate" to a "bit rate," (or "data" to bits, or "amount of data" to "number of bits"), they would have said so in the claims. There is no reason to impose that limitation after the fact through the *Markman* process, other than to aid Microsoft's overall agenda of non-infringement-driven constructions. As such, the added limitation is impermissible. *N. Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1290-91 (Fed. Cir. 2000) ("This court has repeatedly and clearly held that it will not read unstated limitations into claim language.").

Yet again, Microsoft baldly proposes to limit the claims by importing limitations from the specification, without the patentees' requisite clear intent to do so.[14] The words "amount of data" are clear and understandable, and nothing in the intrinsic record *mandates* that an "amount of data" mean only a "number of bits," as opposed to some other amount, or some other data.

---

[13] Apple Claim Construction Order at 1 (construing a larger phrase "providing at the transmitting computer a data stream having a given data rate" to mean "the transmitting computer provides a data stream having a given *amount of data per unit of time*.").

[14] Microsoft rests its construction on instances in the specification that describe a sample upload rate of Kbytes/sec, which is different from Microsoft's proposed limitation of "number of bits" per unit of time.

Indeed, the specification of the ’473 Patent contemplates compressing the data stream in a series of frames, with the compression parameters established by a *frame rate* and *available bandwidth*. *See, e.g.*, ’473 Patent, 2:42-47 (“[p]referably, the transmitting computer compresses the frames in the data stream, most preferably using methods of image and audio compression such as those described in U.S. patent application Ser. No. 08/919,027 [the ’027 application] . . . incorporated herein by reference”), the ’027 application, in turn, stating that “[t]he present invention enables the user to specify the available bandwidth and a frame rate, whereupon the required compression parameters are automatically determined by the source computer based on statistical estimation of the compression ratio and pre-calculation of the file size. . .” (*see* Villegas Decl. Ex. E, U.S. Pat. No. 6,397,230 at 4:62-67).

Even Microsoft’s extrinsic support does not help its cause. *See* Ex. D, Microsoft Computer Dictionary, Fifth Ed., 2002, p. 144 (definition of “data rate” as “the speed at which a circuit or communications line can transfer information, *usually* measured in bits per second (bps)”). As Microsoft’s own cited extrinsic support demonstrates, a “data rate” means more than bits per second, even if that is the more “usual” meaning.

Microsoft’s proffered limitation was unsuccessfully advanced in the *Apple* Case, and should be rejected here as it was in that proceeding. Villegas Decl. Ex. F, Claim Construction Hearing Transcript at 65-66 (unsuccessfully attempting to limit the meaning to “speed, as measured in bits per second. . .”) (hereinafter, “Claim Construction Hearing Transcript”); *Samsung Elecs. Co., Ltd.*, 2004 WL 5644704 at *4, (“*Markman* urges the application of a given court's previous claim construction to a new and independent infringement defendant in the interest of ‘intrajurisdictional uniformity’.”) (additional citations omitted).

**2. Term 3: “a data stream having a given data rate”**

| **Emblaze’s Proposed Construction** | **Microsoft’s Proposed Construction** |
|---|---|
| “a data stream having a given amount of data per unit of time” | “a data sequence with a uniform data rate” |

This next, closely related dispute concerns what it means for a data stream to have a “given” data rate.

Emblaze construes "given" to mean, "assigned" or "specified," not a product of happenstance. This interpretation is consistent with the plain meaning of the term. Villegas Decl., Ex. G, Webster's Third New International Dictionary, 1993, p. 960 (definition of "given," "4a definitely stated, fixed, specified").

Presumably seeking a "hook" to differentiate accused products, Microsoft urges the Court to construe "given" as synonymous with "uniform."[15] Microsoft's desired end goal is apparently to construe "data stream having a given data rate" to mean (coupled with its other proposed constructions): "data stream with a 'uniform' data rate, as measured by a 'number of bits' per unit of time" – such that Microsoft can latch onto a 1-bit variation and claim it does not infringe.

However proposed, the "uniform" limitation actually *contradicts* the express language of the claims. The patent repeatedly refers to varying compression ratios for data: "*Any suitable methods of compression* known in the art may be used." ('473 Patent, 2:47-48) (emphasis added). This means that the patent necessarily contemplates data streams that, though having a rate that is "assigned" or "fixed" rather than random, do not have a rate that is *uniform across the stream*, regardless of how measured. *E.g.*, Claim 16 ("wherein *adjusting* the upload *rate* comprises *changing the compression ratio* [of the data stream]").

The "uniform" limitation also contradicts different embodiments in the specification. For example, the specification clearly explains that, *e.g.*, "[a]lternatively or additionally*, the compression level of the data is varied*, as is likewise described below*, so as to adjust the data streaming rate* to the available bandwidth over one or more channels between computer 34 and server 36" ('473 Patent, 7:44-49) (emphasis supplied).[16] If "given" rate of the stream means

[15] Emblaze's understanding of Microsoft's proposed construction is that it suggests "uniformity" across different time units (*e.g.*, precisely 10 Kbytes of data for every 10-second unit of time), versus an even more restrictive notion of "uniformity" across both different time units and within each unit of time (*e.g.*, precisely 10 Kbytes of data also evenly distributed within a 10-second unit of time, *i.e.*, precisely 1 Kbyte every second, as advanced by Apple). The arguments laid out in this section negate both possibilities.

[16] Indeed, the patent comprehends a variety of data rates that could be assigned ("given") at the transmitting computer. Emblaze's construction encompasses not only an assigned data rate with a precise number of bits per unit of time across the data stream (Microsoft's limitation), but also the types of different rates that can be yielded by different compression methods and different segment durations, such as: (a) data rates with different amounts of data per varying

"uniform" – as Microsoft contends – the plain language of the intrinsic record that teaches "adjustment" of the rate would not be possible. An interpretation that rules out an embodiment, however, is impermissible and should be rejected. *See RF Del., Inc. v. Pac. Keystone Techs., Inc.*, 326 F.3d 1255, 1265 (Fed. Cir. 2003) ("It is improper to construe a claim term in such a way as to "contradict the clear language of the claims.").

Numerous other instances refer to "adjustment" or variation of the data rate. *E.g.*, "For example, as shown in FIG. 3A, time intervals [of the slices of the data stream] . . . are not all equal, but rather are adjusted by computer 34 in response to the transmission rate. Alternatively or additionally, the compression level of the data is varied, as is likewise described below, so as to adjust the data streaming rate to the available bandwidth over one or more channels between computer 34 and server 36" ('473 Patent, 7:42-49); and "Most preferably, the transmitting computer compresses the data at a compression ratio which is varied responsive to the comparison [of the upload rate to the data rate]. Additionally or alternatively, the transmitting computer adjusts the size of one or more of the slices responsive to the comparison." (4:65-5:2).

Microsoft's attempt to distort a snippet from the *Markman* proceedings in the *Apple* Case do not support its proposed construction.[17] Microsoft strives to characterize a reference to a "fixed" rate by Emblaze's counsel in that case as some kind of admission by Emblaze that the rate must be "uniform." "Fixed," however, as used in the *Apple Markman* hearing, meant

---

units of time (*e.g.*, kilobytes per minute or Megabits per 10 seconds); (b) target data rates (rates that have a target of a particular amount of data per unit of time but have variations from one time unit to the next); (c) target bit rates (*i.e.*, nominal or expected rates of the media stream), (d) average data rates (rates that have varying amounts of data per units of time, but average out to a particular rate); (e) maximum or minimum data rates (rates with varying amounts of data per unit of time, but with limitations as to a maximum or minimum); (f) ranged data rates (rates that have varying amounts of data per unit of time from one time unit to the next, but where they fall within a rate interval, (g) multiple data rates (rates with varying amounts of data across different units of time in the data stream), etc. *See, e.g.*, '473 Patent, 6:63-65 ("[T]he computer [34] may typically run . . . standard audio compression software, operating at a sample rate of 8kHz, with 16 bits/sample."); '473 Patent, 11:31-37 ("[F]or video data, H.263 standard compression. . . may be used. . . Other compression methods known in the art, such as MPEG data compression, may similarly be used. . .)"

[17] Apple Claim Construction Hearing Transcript, at 75 ("Emblaze: You're providing at the transmitting computer a data stream having a given data rate. It's got a fixed rate.").

exactly what it does here: assigned, or set. Emblaze's reference in oral argument in that case to a "fixed" rate did not imply that the rate must be "uniform," or without deviation. In the *Apple* Case, as here, Emblaze argued that the rate must be *set*, not an accident.

**3. Term 4: "providing at the transmitting computer a data stream [having a given data rate]"**

| Emblaze's Proposed Construction | Microsoft's Proposed Construction |
| --- | --- |
| "the transmitting computer provides a data stream having a given amount of data per unit of time" | "the transmitting computer provides a data stream for slicing [having a given data rate]"<br><br>"Having a given data rate" need not be construed |

Putting differences about "given" and "data rate" to one side for purposes of the discussion of this term, the dispute focuses on the data stream provided by the transmitting computer. Emblaze's proposal closely tracks the actual claim language. The claims of the '473 Patent require only that the data stream be provided, not that it be provided "for" a dedicated purpose. In contrast, Microsoft seeks to qualify the plain claim language and require that the data stream being "provided at the transmitting computer,"[18] be "for slicing."

The step of dividing the data stream into slices is described separately from "providing" in the claims. Indeed, the portions of the specification that Microsoft cites as putative support merely recite the uncontested fact that a data stream is being divided into slices.[19] The same holds true of excerpts from the *Apple* Case cited by Microsoft. Apple Claim Construction Hearing Transcript, at 66 ("Emblaze: [Y]ou provide in the transmitting

---

[18] As with other terms construed in both matters, Emblaze proposes the same construction for the remaining part of this term ("providing at the transmitting computer a data stream") that was ordered in the *Apple* Case. Apple Claim Construction Order, at 1. Emblaze's construction of "providing at. . ." is consistent with the ordinary meaning of the claim term, and is supported by the patent specification, *e.g.*, "the data stream [is] . . . generated by the transmitting computer 34" ('473 Patent, 2:31-32); "the data stream comprises multimedia data captured or generated by the transmitting computer" (2:29-31); and "although data inputs of other types may be generated at or by computer 34. . ." (6:33-34). As these passages make clear, the data stream is provided *at* the transmitting computer (and is, as previously discussed, provided with an *assigned* data rate). No further clarification is necessary.

[19] *See, e.g.*, '473 Patent, 2:4-6 ("The data stream is divided into a sequence of segments or slices . . ."); 2:17-21 ("The division of the data stream into slices and the inclusion of the slice indices in the data stream . . .").

computer a data stream having a given data rate; then as you'll see, you slice it to create these uniform, these predetermined data slices. . .")

If "providing at the transmitting computer a data stream" already means that the stream is "for slicing," as Microsoft would have it, there would be no need to claim "dividing" elsewhere. Such a construction is disfavored. *See, e.g., Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("[a] claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

**4. Term 5: "each slice having a predetermined data size associated therewith"**

| Emblaze's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| "each slice having a data size, which may be established by setting a time duration of the slice, assigned in advance of the stream being divided"[20] | "each slice having a data size (i.e., number of bits) assigned in advance of the stream being encoded (A slice's data size may be assigned by assigning a time duration that would necessarily produce a slice of a certain data size given the data rate of the stream" |

The dispute here revolves around the meaning of a "predetermined data size." Emblaze proposes the same construction as ordered in the *Apple* Case. Apple Civil Minute Order, at 1.

The parties do not seem to dispute that a data size of a slice may be established by setting a time duration, irrespective of the compression methodology, and the specification supports that notion.[21] In addition to the specification, dependent claims also support this notion of data size in relation to "a time duration." [22] *Phillips*, 415 F.3d at 1314 (holding that

[20] Emblaze proposes the same construction as in the *Apple* Case. Villegas Decl., Ex. H, Civil Minute Order (D.E. #214) (hereinafter, the "Apple Civil Minute Order"), at 1. This Civil Minute Order was issued after the submission of the parties' Joint Claim Construction and Prehearing Statement.

[21] *See, e.g.*, "The data stream is divided into a sequence of segments or slices of the data, preferably time slices" ('473 Patent, 2:4-5); *see also* 3:40-42; 5:33-35; 7:23-25; 7:33-34; 11:52-55.

[22] For example, Claim 23, which depends from claim 1, states that "wherein dividing the stream into the sequence of slices comprises dividing the stream into a sequence of time slices, each having a predetermined duration associated therewith." Thus, Claim 23 also makes clear that the predetermined data size of the slices in Claim 1 may comprise a "predetermined duration." Claim 37 is even more explicit in terms of what "data size" may comprise. In this

"[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term.").

Microsoft attempts to narrowly limit the "predetermined data size" term in two ways. *First*, Microsoft seeks to limit the "data size' to a "certain" "number of bits" that is *necessarily* produced when a time duration is assigned. *Second*, Microsoft seeks to alter the time when the predetermination occurs to a time before the *stream* is "encoded" (as opposed to a time before the stream is "divided").

Microsoft's "number of bits" limitation is impermissibly narrow because, as more fully described above in connection with Terms 2-4, Microsoft's restriction to a "number of bits" across all time units in the stream is contrary to the plain and ordinary meaning and the specification, and disregards different contemplated compression methodologies. The same reasons apply to Microsoft's restriction of a time slice to a "certain," *necessarily produced*, "number of bits," making it equally impermissible.

Microsoft's temporal limitation, *i.e.*, that the data size is assigned "in advance of the *stream* being *encoded*" is also improper because it would mean that an embodiment in the specification is backwards (emphasis added). Such a construction conflicts with the specification. Specifically, the '473 Patent describes an embodiment in which a data *stream* is first "encoded" by preferably compressing it, and *only* then is a data size assigned in the form of a time duration. This all precedes dividing the stream into slices. *See* '473 Patent, FIG. 7 and 11:23-59; 9:66 – 10:1 ("[t]he data are compressed at step 80, and are then 'sliced' at step 82 into files. . ."). The "step 82" referenced in the foregoing sentence is further detailed in FIG. 7 of the '473 Patent, which shows that the duration (and hence data size) is assigned before the slice is prepared as a file, and after compression of the data stream ("encoding" of the stream) in step 80.

---

latter claim, which depends from Claim 25, the claim language reads "wherein the predetermined *data size* of each of the slices corresponds to a time duration of the slice" ('473 Patent, 16:51-53) (emphasis added).

**5. Term 6: "wherein dividing the stream into the sequence of slices comprises dividing the stream into a sequence of time slices, each having a predetermined duration associated therewith" and "wherein the predetermined data size of each of the slices corresponds to a time duration of the slice"**

| Emblaze's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| "the stream is divided into a sequence of slices, where the predetermined data size of the slices is established by setting the time duration of the slices" | "the stream is divided into a sequence of slices, where the predetermined data size of a slice is established by assigning a time duration that would necessarily produce a slice of a certain data size given the data rate of the stream" |

Emblaze proposes the same construction as ordered in the *Apple* Case (Apple Claim Construction Order, at 2-3), which is consistent with the ordinary meaning, and supported by the specification. For example, the specification states that "[t]he data stream is divided into a sequence of segments or slices of the data, preferably time slices . . ." '473 Patent, 2:4-5; and "[t]he sizes of the files may be varied by adjusting slice durations $T_1$, $T_2$, $T_3$, etc. . . ." 9:33-35. *See also* 5:33-35; 7:18-25; 8:56-9:5; 11:53-12:17; 13:41-45.

Microsoft's desired construction for this term is related to the same concept of a uniform "bit rate" that underlies many if not all its other constructions. In Microsoft's proposal, time will necessarily produce a slice of a "certain size," based on the "data rate" (which, as discussed earlier, Microsoft improperly seeks to limit to a "number of bits"). That is, at x bits/second, a 30 second duration will necessarily produce a slice of a certain number of bits.

As explained above, however, setting the time duration of a slice may establish a data size without fixing the data size as a "certain" number of bits. Different types of compression may be used, yielding different compression ratios and, thus, different data sizes. The slice's data size need not <u>necessarily</u> have a precise and unwavering ("<u>certain</u>") number of bits as Microsoft contends. Rather, all this term requires is what its plain meaning says: *i.e.,* that the data size of slice be set by a time duration, as opposed to another measure whereby slices could be divided.

**6. Term 11: "uploading the sequence to a server at an upload rate generally equal to the data rate of the stream" and "uploads the sequence to a server at an upload rate generally equal to the data rate"**

| Emblaze's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| "transmitting the files from the transmitting computer to the server at an upload rate generally equal to the data rate of the stream" | "uploading the sequence from the transmitting computer to the server at a data rate (as construed above) that is generally equal at all points in time to the data rate of the stream" |

Just as with multiple other constructions, Emblaze proposes the same construction ordered in the *Apple* Case,[23] according to which the files are transmitted at an upload rate generally equal to the data rate of the stream. The intrinsic support for Emblaze's plain and ordinary meaning construction is extensive. *See, e.g.*, '473 Patent, 2:7-9 ("The transmitting computer uploads the sequence of slices to the server substantially in real time."); 3:43-45 ("Preferably, uploading the sequence includes comparing the upload rate to the data rate and adjusting the upload rate responsive to the comparison"); 7:27-34 ("Computer 34 stores each slice as a corresponding file . . . The files are uploaded to server 36, such that while any given slice (other than first slice 42) is being created, one or more preceding slices are in the process of being uploaded").

Microsoft again adds an improper limitation by requiring the upload rate to be generally equal to the stream's data rate "*at all points in time.*"[24] This limitation adds ambiguity rather than clarifies anything. The patent itself does not specify, and Microsoft does not explain, what the relevant "points in time" supposedly represent, and when exactly must the "generally equal" rate be equal at "*all points in time*" as Microsoft claims is required to be the case.

---

[23] Apple Claim Construction Order, at 2.

[24] Emblaze's understanding of Microsoft's position, as discussed in Footnote 15, is that "given" data rate is "uniform" across time units (from one unit to the next), and not both across and within time units ("uniform" at every point in time within a time unit and across all time units). (For a more detailed discussion concerning time unit uniformity, see Footnote 15). Thus, Microsoft's limitation "generally equal at all points in time" appears to apply across time units (because the files representing different slices are uploaded as a unitary segment) and not also within each of them; otherwise, the limitation would be nonsensical and would add more ambiguity to the claim construction.

In addition to the claims not expressly reciting the "at all points in time" limitation, the specification teaches away therefrom by allowing for fluctuation between the rates. *See, e.g.*, '473 Patent, 11:65-12:5 ("the FTP upload rate over link 60 *will fluctuate* …. [T]he time required to upload file 42 is measured and compared to $T_1$, at the same time as file 44 (slice 2) is being encoded and prepared. Responsive to this measurement of upload time, the duration of subsequent slices … is adjusted."); 12:13-17 ("if it is determined that the upload time for file 42 … is substantially shorter than duration $T_1$, the duration of subsequent files may be extended, and/or the compression ratio may be decreased, so as to take better advantage of the available bandwidth."); 12:36-39 ("links … continue to operate until and unless it is determined that one of the links … is operating at an *unacceptably slow* data transfer rate.") (emphasis added).

Since the specification allows the fluctuation between the rates over time, and a "given data rate" could cover a number of different data rate types that could be assigned at the transmitting computer, many of which would not result in the same or similar amounts of data per units of time, it would be improper to import the limitation of matching an exact correspondence between a data rate and an upload rate "at all points in time." *In re Katz*, 639 F.3d at 1324 ("[T]here is a strong presumption against a claim construction that excludes a disclosed embodiment . . ."); *Dow Chemical Co. v. Sumitomo Chemical Co., Ltd.*, 257 F.3d 1364, 1378 (Fed. Cir. 2001) ("[I]t is also well established that a claim construction that excludes a preferred embodiment is 'rarely, if ever, correct,'") (*citing Vitronics*, 90 F.3d at 1583).

The reason why Microsoft seeks to graft onto the claim language a requirement that the rate be equal "at all points in time" is, again, part and parcel of its effort to dodge infringement by setting up straw man consistency requirements not found in the patent.

**7. Term 13: "such that the one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate"**

| Emblaze's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| "such that one or more client computers are able to select individual files corresponding to the slices for download over the network at a download rate generally equal to the data rate" | "such that one or more client computers can receive the sequence over the network from the server at a data rate (as construed above) that is generally equal at all points in time to the data rate of the stream" |

Emblaze proposes the same construction as ordered in the *Apple* Case (Apple Claim Construction Order, at 2), which is consistent with the patent's specification. *See, e.g.*, '473 Patent, 2:11-12 ("The clients download the data stream from the server . . ."); 2:15-17 ("The clients use the slice indices of the frames to maintain proper synchronization of the playback"); 2:17-21 ("The division of the data stream into slices and the inclusion of the slice indices in the data stream to be used by the clients in maintaining synchronization allows the broadcast to go on substantially in real time without the use of special-purpose hardware."); (10:45-48) ("Responsive to a user input, client 30 selects an appropriate starting slice and begins to download and decode (decompress) files 42, 44, 46, etc.").

As in Terms 11-12 above, the parties dispute whether the rates are generally equal "at all points in time," and Emblaze incorporates its arguments set forth above with regard to those and other terms as if fully set forth herein.

The parties additionally dispute the meaning of "download." Just as with "uploading" above, Microsoft can cite to nothing in the claims to support that the download rate is always generally equal "at all points in time" to the data rate. Indeed, the portions of the specification cited by Microsoft favor Emblaze's construction. For example, at 3:5–13, the specification notes that "If the monitored data transfer rate changes during transmission, the quality level is preferably reselected accordingly." *See also* 4:16-28 (replacing the download link when its data rate becomes lower than a predetermined level, indicating fluctuations of the download link rates); 7:35-41 (clients 30 monitor the time codes as the file is received to ensure that the transmission is "keeping up," but it recognizes that there may be a lag, in which event steps are taken to increase reception rate). Further, the passages in the '473 Patent cited with regard to

upload rate in Term 11 above are applicable here as well in that data rates can fluctuate with time and the '473 Patent contemplates adjusting for such fluctuations.

### C. "Encoding the slices," "quality levels," and "decode the sequence"

This section implicates three related concepts: the formation of files from slices, quality levels, and decoding. *See*, JCCPS, Terms 7-9.

#### 1. Term 7: "encoding the slices in a corresponding sequence of files" and "encodes the slices in a corresponding sequence of files"

| Emblaze's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| "forming each slice as a file, wherein a file includes compressed data from the slice and a file descriptor, and wherein the sequence of files corresponds to the sequence of slices" | "compressing the data from each slice and saving the compressed data from each slice into a file corresponding to that one slice" |

Emblaze proposes the same construction as ordered in the *Apple* Case.[25] The parties' dispute revolves around the meaning of "file" and "encoding the slices."[26] Emblaze incorporates its "file" arguments (Term 1) as if fully set forth herein.

Emblaze's construction of "encoding the slices" is plainly "forming each slice as a file," and is supported by the patent specification and its figures. [27] The extrinsic evidence further supports Emblaze's construction. For example, Microsoft's Computer Dictionary defines "**encode**" as frequently involving "*changing the form*."[28] It also defines "**encoder**" to mean a hardware or software that *converts* the information to a *particular form or format*.[29] The same dictionary further provides a telling example: "For example, the Windows Media Encoder *converts* audio and video *to a form* that can be streamed to clients over a network." *Id*. Hence, the ordinary meaning of "encoding" the slices is "forming" those slices as files.

---

[25] Apple Claim Construction Order, at 2.

[26] Microsoft does not seem to dispute that the sequence of files corresponds to the sequence of slices.

[27] '473 Patent, 2:22-23 ("Preferably, each segment or slice is *contained* in a separate, respective file" (emphasis added); '473 Patent, Fig. 3D (which shows file descriptors contained in each file of a file format data stream 41, along with the data slice).

[28] *See* Villegas Decl., Ex. D, (Microsoft Computer Dictionary), at 192 ("2. . . . to put something into code, which frequently involves *changing the form* -- for example, changing a decimal number to binary-coded form." (emphasis added).

[29] *Id*. ("1. . . . any hardware or software that *encodes* information --- that is, *converts the information to a particular form or format*.").

In contrast, Microsoft's construction erroneously requires (1) *compression of* the data *from each slice* (*i.e.*, compression *after* the slicing) and (2) the "*saving* . . . into a file." Microsoft's "compression" (after slicing) requirement is misplaced because when the patent text relates encoding and compression, it does so in context of the entire data *stream*, not individual slices. The dependent claims illuminate this point. *See, e.g.,* Claim 16 (which depends on Claim 1 via Claim 15) is directed to encoding "the stream," *i.e.*, "compressing" data in the stream ("wherein encoding the stream comprises compressing data in the stream. . .") (emphasis added). This claim language is explicated in the '473 Patent specification wherein compressing data in the stream is the process that occurs *before* the stream is sliced (*e.g.*, '473 Patent, 9:62-10:5 and Figure 7; 11:26-27 ("[i]n encoding data stream 40 [step 80 in FIG. 7 that occurs before the dividing into slices step 82], computer 34 preferably compresses the data. . ."). This is discussed above in connection with the "data rate," which may be adjusted by adjusting the compression ratio of the stream.

Conversely, "encoding" of the slices only happens *after* the stream is "sliced." *See, e.g.,* '473 Patent, 12:1-2 (referring to "*file 44 (slice 2)*" as it is "being *encoded* and prepared.") (emphasis added)). Hence, it is clear that encoding in the context of slices (that occurs after the stream is divided) is *not* referring to compression (that occurs before the stream is divided). Indeed, this very argument (that "encoding" is "compression" even with respect to slices) has already been advanced by Apple and rejected by the court in the *Apple* Case. There is no reason to disturb the existing claim construction for this term. *Sears Petroleum & Transport Corp. v. Archer Daniels Midland Co.*, 2007 WL 2156251 at *8 (N.D.N.Y. July 24, 2007), citing *KX Indus., L.P. v. PUR Water Purification Products, Inc.*, 108 F. Supp. 2d 380, 387 (D. Del. 2000) and *Markman v. Westview Instrs., Inc.*, 517 U.S. 370 (1996) (deference is ordinarily given to a court's prior claim construction when no new arguments are raised).

Microsoft's "saving" limitation is equally misplaced—the claims do not have it, and the specification offers no support therefor. It would be decidedly strange for the patent to require "saving" as an additional step, as Microsoft contends, and yet say nothing about it. Hence, the "saving" limitation should not be imported. *See Golight, Inc.*, 355 F.3d at 1331 ("While claims must be construed in light of the specification, limitations from the

specification are not to be read into the claims, for it is the claims that measure the invention.") (internal quotation marks and citations omitted).

**2. Term 8: "encoding slices at a plurality of different quality levels" and "slices are encoded at a plurality of different quality levels"**

| Emblaze's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| "forming slices at more than one quality level" | "compressing the slices from the data stream at more than one quality level" |

Emblaze's proposed construction is the one adopted in the *Apple* Case,[30] and is supported by the patent specification, *e.g.*, '473 Patent, 3:5-6 ("the slices are provided by the server at multiple resolution or quality levels"); 4:39-43 ("encoding the slices includes encoding slices at a plurality of different quality levels").

As explained above in connection with at least Term 7, Microsoft's construction improperly construes the term "encoding" (the slices) as "compressing" (each of those slices).

**3. Term 9: "decode the sequence"**

| Emblaze's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| "decompressing any compressed data in the sequence" | "decompressing compressed data in the sequence" |

The difference between the parties is Microsoft's attempt to exclude, "any," from the construction adopted in the *Apple* Case and replicated herein by Emblaze.[31] This single word has important implications for claim construction.

Emblaze's construction contemplates different embodiments in the specification, which decompress *any or all* compressed data contained in the sequence. For example, it contemplates decompressing all compressed data in the sequence (*e.g.*, '473 Patent, Fig. 6A, 2:47-49), but it also contemplates decompressing different portions of the sequence. These portions include, *e.g.*, one quality level in a multi-quality-level sequence (Fig 6B and 10:64–11:8), different portions from different quality levels in the stream (Fig 6B and 11:9-22), or even a portion of a single-quality level stream (Fig. 6A and 10:42-50). Emblaze does not see

[30] Apple Claim Construction Order, at 2.
[31] Apple Claim Construction Order, at 2.

the need to alter the construction as provided by the Court in the *Apple* Case, and in fact is estopped from taking an inconsistent position. *Curtiss-Wright Flow Control Corp. v. Z&J Technologies GmbH*, 563 F. Supp. 2d 1109, 1121 (C.D. Cal. 2007).

In contrast, Microsoft seeks to remove "any" to effectively require that *all* compressed data in the sequence be decompressed, and would impermissibly read out from the claims the embodiments laid out above. The already adopted construction should stand.

### D. Remaining Terms for Construction

The remaining terms identified for construction are discussed below.

#### 1. Term 14: "play back the data stream responsive to the indices of the files" and "play back the data stream responsive to the indices thereof"

| Emblaze's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| "playing back the data stream based on the indices of the files to be played back" | Does not need a construction. In the alternative, plain meaning to a person of ordinary skill in the art in view of the claims and the disclosure. |

#### 2. Term 15: "at a replay rate generally equal to the data rate" and "at a data replay rate generally equal to the data rate"

| Emblaze's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| "the rate at which the client plays back the data stream is generally equal to the data rate of the stream" | Does not need a construction. In the alternative, plain meaning to a person of ordinary skill in the art in view of the claims and the disclosure. |

#### 3. Term 16: "uploading and updating an index file containing the index of the file in the sequence that was most recently uploaded"

| Emblaze's Proposed Construction | Microsoft's Proposed Construction |
|---|---|
| "uploading to a server an index file, and updating the index file with the index of the most recently uploaded file" | Does not need a construction. In the alternative, plain meaning to a person of ordinary skill in the art in view of the claims and the disclosure. |

#### 4. Term 17: "determining a data bandwidth of the network between the server and the client computer"

| **Emblaze's Proposed Construction** | **Microsoft's Proposed Construction** |
|---|---|
| "the client determines a data rate at which a client can download a file from the server" | Does not need a construction. In the alternative, plain meaning to a person of ordinary skill in the art in view of the claims and the disclosure. |

For each of the Terms 14-17, Emblaze proposes the construction adopted in the *Apple* Case,[32] which are supported by the intrinsic record. For example, support for Term 14 can be found at *e.g.*, '473 Patent, 8:1-5; 8:32-41; 10:42-48, and Figures referenced therein. The expression "indices of the files" should be construed consistently with "each file having a respective index" in claim Term 10. Similarly, support for Term 15 can be found at *e.g.*, 10:24-11:22, and Figures referenced therein; for Term 16 at *e.g.*, 7:59-62[33], 7:65-66[34], and 10:3-5[35]; and for Term 17 at: *e.g.*, 3:5-13; 9:6-9; and 10:64-11:22.

Construction of the above terms will avoid a later disagreement as to their precise meaning. Hence, the Court should presently resolve this dispute and not defer the resolution for later. *See, e.g., Pressure Products Medical Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1316 (Fed. Cir. 2010) (affirming district court's decision to construe a term *sua sponte* when it became clear that the meaning was disputed between the parties); *see also*, *O2 Micro Int'l. Ltd. v. Beyond Innovation Technology Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it.").

DATED: September 12, 2013

COHEN & GRESSER LLP

By: */s/ Alexandra Wald*
Alexandra Wald

Attorneys for Plaintiff Emblaze Ltd.

---

[32] Apple Claim Construction Order, at 2.

[33] "FIG. 3B is a block diagram that schematically illustrates an index file 50, which is created by computer 34, and is uploaded to server 36, in accordance with a preferred embodiment of the present invention."

[34] "Each time a new file 42, 44, 46, etc. is uploaded, ID 52 in file 50 on server 36 is updated."

[35] "Each time a new file is uploaded to the server, index file 50 (FIG. 3B) is updated, at step 86."

**CERTIFICATE OF SERVICE**

I hereby certify that on September 12, 2013, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/EMF registrants for this case.

*/s/ Scott R. Raber*
Scott R. Raber