Eric L. Wesenberg (SBN 139696)
EWesenberg@perkinscoie.com
Christopher L. Kelley (SBN 166608)
ckelley@perkinscoie.com
Kenneth J. Halpern (SBN 187663)
KHalpern@perkinscoie.com
PERKINS COIE LLP
3150 Porter Drive
Palo Alto, CA 94304-1212
Telephone: 650.838.4300
Facsimile: 650.838.4350

Antoine M. McNamara (SBN 261980)
AMcNamara@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, WA 98101
Telephone: 206.359.8000
Facsimile: 206.359.9000

Isabella E. Fu (SBN 154677)
Associate General Counsel
Microsoft Corporation
One Microsoft Way
Redmond, WA 98052
Telephone: 425.882.8080
Facsimile: 425.936.7329

*Attorneys for Defendant
Microsoft Corporation*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| EMBLAZE LTD,<br><br>            Plaintiff,<br><br>    v.<br><br>MICROSOFT CORPORATION,<br><br>            Defendant. | Case No. 3:12-cv-05422-JST<br><br>**MICROSOFT CORPORATION'S RESPONSIVE CLAIM CONSTRUCTION BRIEF** |

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ............................................................................................. 1

       A.     The Invention and its Purpose as Set Out in the Specification .............................. 1

       B.     Principles of Claim Construction .......................................................................... 2

II.    DISPUTED CONSTRUCTIONS .................................................................... 5

       A.     "file" / "files" (Term 1) ........................................................................... 5

       B.     "a data rate" (Term 2) .............................................................................. 10

       C.     "a data stream having a given data rate" (Term 3)................................ 12

       D.     "providing at the transmitting computer a data stream" (Term 4) ....... 14

       E.     "predetermined data size" (Terms 5 & 6) ............................................. 15

       F.     "encoding the slices" (Terms 7, 8 & 9)................................................. 17

       G.     "each file having a respective index" (Term 10) ................................. 19

       H.     "uploading the sequence" (Term 11) .................................................... 20

       I.     "download rate generally equal to the data rate" (Term 13)................. 24

       J.     Other terms (Terms 14 through 17) ...................................................... 25

# TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|

*Aircraft Technical Publishers v. Avantext, Inc.*,
    2009 WL 3817944 (N.D. Cal. Nov. 10, 2009)........................................................................ 4

*Altiris, Inc. v. Symantec Corp.*,
    318 F.3d 1363 (Fed. Cir. 2003) .......................................................................................... 14

*E-Pass Technologies, Inc. v. 3Com Corp.*,
    473 F.3d 1213 (Fed. Cir. 2007) .......................................................................................... 14

*Intamin Ltd. v. Magnetar Technologies Corp.*,
    483 F.3d 1328 (Fed. Cir. 2007)........................................................................................ 8, 24

*Johnson & Johnston Associates Inc. v. R.E. Serv. Co., Inc.*,
    285 F.3d 1046 (Fed. Cir. 2002) ........................................................................................ 8, 10

*Moore U.S.A., Inc. v. Standard Register Co.*,
    229 F.3d 1091 (Fed. Cir. 2000) ............................................................................................ 8

*O2 Micro Int'l. Ltd. v. Beyond Innovation Technology Co., Ltd.*,
    521 F.3d 1351 (Fed. Cir. 2008)........................................................................................... 3, 6

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ................................................................... 2, 3, 19

*PODS, Inc. v. Porta Stor, Inc.*,
    484 F.3d 1359 (Fed. Cir. 2007).................................................................................... passim

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002) ............................................................................................. 3

*Texas Instruments, Inc. v. Linear Techs. Corp.*,
    182 F. Supp. 2d 580 (E.D. Tex. 2002) .................................................................................. 4

*TIP Systems, LLC v. Phillips & Brooks/Gladwin, Inc.*,
    529 F.3d 1364 (Fed. Cir. 2008).............................................................................................. 8

*Townshend IP, LLC v. Broadcom Corp.*,
    2008 WL171039 (N.D. Cal 2008).......................................................................................... 4

*Vivid Technols., Inc. v. American Sci. & Eng'g, Inc.*,
    200 F.3d 795 (Fed. Cir. 1999) ............................................................................................... 4

# I.   INTRODUCTION

## A.   The Invention and its Purpose as Set Out in the Specification

The '473 patent purports to disclose a novel method of "real time broadcasting" of video and/or audio data over a computer network. Ex. B, '473 patent, Abstract. The claims reference three distinct components: a transmitting computer from which the broadcast is prepared and transmitted, a server (an intermediate computer that serves the requests of other computers on the network), and one or more client computers (or "clients") that receive the broadcast. *Id.* at 2:7–15. Broadly, the claimed method involves taking a raw data stream that is received at the transmitting computer and dividing it into a sequence of slices of a pre-set size. The slices are compressed and encoded at the transmitting computer and saved as a sequence of files, one per slice. The files are then uploaded to a server such that they can be downloaded to the clients.

Significantly, the system uses standard computing components, consistent with the invention's stated object of enabling "high-bandwidth data streaming" from a personal computer through "common, existing server and network infrastructure," over the Internet, using widely supported communication protocols. *Id.* at 1:50–67. The patent identifies the option of using inexpensive, standard components as the key advantage afforded by the invention, in contrast to prior art methods that required "high-cost" dedicated encoders and broadcast servers — placing real-time broadcasting out of the reach of the "general clientele" of Internet service providers. *Id.* at 1:34–47. Indeed, every stated "object" of "the present invention" relates to this same purported benefit. *Id.* at 1:50–67. Consistent with this objective, the patent repeatedly discloses that when uploading and downloading, the components of the system utilize standard Internet protocols, such as HTTP (HyperText Transfer Protocol), FTP (File Transfer Protocol), UDP, and RDP. *Id.* at 2:7–15, 2:60–62, 3:60–66, 5:19–28, 6:50–54, 7:5–17, 10:35–38, 10:67–11:2, 12:18–20.

The patent's insistence that its invention was designed to enable real-time broadcasting with standard, non-specialized hardware and software components provides an essential frame for claim construction. The patent references and makes use of basic computing concepts like "file," "data," and "encode," and it consistently employs these terms in their ordinary sense. Absent

clear indication in the intrinsic record that the applicants intended to redefine these terms, they must be given their standard and ordinary meanings in the art at the time of the invention.

### B. Principles of Claim Construction

While Microsoft concurs generally with the principles of claim construction as stated in Emblaze's brief, certain critical corrections are needed. *See* Dkt. No. 52, at 1–5. Emblaze sets forth the standard hierarchy of claim construction sources established by *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) — the claim language itself, the specification, and the extrinsic evidence. However, it improperly attempts to exclude technical dictionary definitions altogether (while relying on them selectively), misapprehends the concept of "ordinary meaning," and uses this approach to avoid constructions that would comport with the widely accepted definitions of basic computing terms, such as "file" and "data rate." Indeed for most terms, Emblaze seeks to avoid construction altogether. Its strategy appears to be that if the claims are left effectively unconstrued, their scope will remain uncertain, and the case will survive summary judgment. This would thwart the purpose of claim construction, which as even Emblaze acknowledges, is to resolve, and not defer, the disputes between the parties. *See* Dkt. No. 52, at 25.

Microsoft's approach comports with *Phillips* — it begins with the claim language and looks to the specification as "the single best guide to the meaning of a disputed term." 415 F.3d at 1315, *quoting Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). For well-known computing terms, Microsoft has adduced technical dictionary definitions, while showing their consistency with the usage in the specification. *See* 415 F.3d at 1318 ("We have especially noted the help that technical dictionaries may provide to a court to better understand . . . the way in which one of skill in the art might use the claim terms.") (quotations omitted). In response, Emblaze attacks these commonplace definitions by arguing that if they were what the patentee intended, they would be "clearly described in the claim language." Dkt. No. 52, at 7 (in reference to the definition of "file" found in the *Microsoft Computer Dictionary*, a definition also cited by Emblaze). The notion that the claim language itself must expressly define a term as basic as "file," or other standard computer terms, defies common sense.

When Emblaze does turn to the patent specification, it arbitrarily pulls some features from the disclosure and treats these as definitional of claim meaning while ignoring other more relevant passages or disparaging them as specific embodiments. For example, Emblaze proposes construing "file" to require nothing more than data and a "file descriptor" — a term that appears nowhere in the specification. Emblaze bases its definition on a reference to two fields that can be included in the data structures used by patent, but it largely ignores the more relevant discussions of how files are actually stored, read, and transferred. Because neither "file descriptor" nor "descriptor" appears in the patent, and Emblaze offers no definition of these terms, the result is a construction that eliminates the troublesome (for Emblaze) word "file," and the characteristics of files pertinent to the invention, in favor of an invented phrase too vague to resolve the parties' dispute over the whether the "file" limitation is infringed. Thus, Emblaze attempts to read the particular contents of the embodiments into the claim terms in order to *avoid* defining them. This violates both the principle that the features of the embodiments should not ordinarily be imported into the claims, *Phillips*, 415 F.3d at 1323, and the "'heavy presumption' that a claim term carries its ordinary and customary meaning "absent clear lexicography or disavowal of claim scope." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002).

Emblaze's furious contortions to deflect evidence of the ordinary meanings of well-known terms are particularly inappropriate given that the constructions it proposes create the very ambiguity the extrinsic evidence is meant to clarify. Dkt. No. 52, at 2 (acknowledging that extrinsic evidence may be considered to resolve ambiguity of disputed term). The heavy presumption of ordinary meaning is particularly pertinent here, because most of the terms in dispute are common computing terms. Simply put, any person of ordinary skill in the art reading the '473 patent would understand terms such as "file" and "data rate" to have their ordinary meanings, unless the patent contained a special definition, which Emblaze does not argue is the case. By obfuscating these terms, Emblaze's definitions fail to perform the critical role of claim construction. *O2 Micro Int'l. Ltd. v. Beyond Innovation Technology Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("When the parties present a fundamental dispute regarding the scope of a

claim term, it is the court's duty to resolve it."). They serve only Emblaze's purpose of prolonging the case.

Emblaze seeks to justify its proposals by wielding Magistrate Judge Grewal's constructions in the *Apple* case. Yet the weight of authority holds that this Court should not defer to those constructions and must consider the merits of the parties' arguments independently in the context of this case. *Aircraft Technical Publishers v. Avantext, Inc.*, 2009 WL 3817944, *3 (N.D. Cal. Nov. 10, 2009) ("[T]his Court has an independent obligation to construe the claims in dispute, and to render its own independent claim construction."). Because a court need only construe a patent's claims to the extent necessary to resolve the specific disputes in the case before it, the disputes over a given term's construction will vary case-by-case. *Vivid Technols., Inc. v. American Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999) ("[O]nly those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy."). Many issues Microsoft raises here appear not to have been raised in the *Apple* litigation, perhaps due to differences in the allegedly infringing technologies. As a consequence, those issues were simply not decided, and this Court should not assume that Judge Grewal's constructions are intended to address or resolve them. Moreover, due process requires each defendant be afforded to opportunity to litigate its case and argue for its proposed constructions. *See Texas Instruments, Inc. v. Linear Techs. Corp.*, 182 F. Supp. 2d 580, 586 (E.D. Tex. 2002) ("To a case, . . . district courts . . . have concluded that defendants in a later proceeding . . . should have the opportunity to brief and argue the issue of claim construction, notwithstanding any policy in favor of judicial uniformity."). Where, as here, the prior case involves a different product, raises different issues, and the parties present different proposed constructions and different supporting arguments, deference to the prior construction is inappropriate. Critically, the term "file" was not an issue in the *Apple* case because the parties do not dispute whether Apple's technology uses files or not. *Townshend Intellectual Prop.*, 2008 WL 171039 at *3 (modifying prior claim construction in light of a new party's arguments); *Texas Instruments*, 182 F. Supp. 2d at 589 ("Where defendants have new arguments to bring to the attention of the court, defendants' rights to fully litigate their claims are particularly persuasive."). Moreover, the persuasiveness, if

any, of a prior construction can only derive from its reasoning. Judge Grewal has yet to provide any reasoning for his constructions (and, indeed, has already modified one of his initial constructions), so the precise meanings of the constructions in some cases are not yet clear, and thus they should have little, if any, persuasive effect.

## II.    DISPUTED CONSTRUCTIONS

### A.    "file" / "files" (Term 1)

|  | Emblaze | Microsoft |
|---|---|---|
| "file" / "files" (claims 1, 8, 9, 10, 11, 25, 40) | Does not need construction. Alternatively: "a slice of data that has a file descriptor." | "the collection of data stored in a directory and accessed by a file name for editing and saving" |

The dispute here is over whether "file" should be construed at all and if it is construed, whether it is synonymous with the separate claim term "slice" (differing only by virtue of having a "descriptor") or whether it refers to data stored in a directory under a "file name."

Microsoft's definition of file has three essential features: (i) a file is stored (ii) in a directory, and (iii) it is accessed using a file name unique to that file.[1] Emblaze asks that the Court provide no definition or, alternatively, that the Court define a file as any "slice of data" that has a "file descriptor," a term nowhere used in the specification and for which Emblaze provides no evidence of use in the art. Emblaze proposes "file descriptor" as a synthesis of two features associated with files at different points in the specification: file names, '473 patent at 7:66–8:1, and level or size identifiers, *id.* at 8:47–50. But file names and level and size identifiers are not described as having similar purposes. The file name is used as a reference for identifying which file to download, *id.* at 7:66–8:7, whereas the level and size identifiers are part of the slice data contained ***within*** the file, *id.* at 9:66–10:1, and, therefore, cannot be used before the file is retrieved. There is no teaching in the patent that the level or size identifiers are used to retrieve files and no basis in the patent to lump these very different objects together as examples of a class

---

[1] The file name of each file identifies that specific file and, therefore, must be unique. Different subsets of data within a single stored file are not separate files for at least the reasons that they are commonly stored and have a common file name. If the Court wishes to make this requirement explicit, it could adopt the following modified construction: "the collection of data stored in a directory and accessed by a *unique* file name for editing and saving."

of "descriptors." Emblaze's definition is also vague and unhelpful, since "file descriptor" is not a self-explanatory term, and Emblaze has offered no definition. Emblaze's definition is also too broad because it would treat any "slice of data" as a file so long as something can be characterized as a "descriptor" of that slice. This contradicts the way "file" is used in the patent and its meaning in the art. Moreover, Emblaze's alternative proposal to refrain from construing "file" would wastefully postpone resolution of an issue that is central to this dispute and potentially case-dispositive. Dkt. 52, at 25, *citing O2 Micro*, 521 F.3d at 1362 (noting that "it is the court's duty to resolve" disputes as to the scope of a claim term).

Microsoft's definition is consistent with the patent, which distinguishes "segments" and "slices" of data from "files." *See, e.g.*, '473 patent at 2:3–6, 2:22–23, 7:24–28. The patent describes that the data stream is sliced and then the transmitting computer 34 "stores each slice as a corresponding file." *Id.* at 7:27. This passage makes clear that slice and a file must be different things and that a slice is encoded and "***stored***" as a file. *See also id.* at 2:22–23 ("each segment or slice is contained in a separate, respective file") (emphasis added). In addition to being "stored," *id.* at 7:27, 7:55–58, 8:26–29, the patent describes that a file is "saved," *id.* at 7:52–53, and that a file has a "file name," *id.* at 7:66–8:1. Emblaze cites portions of the patent that describe other possible contents of a "slice" (which has been stored as a file), Dkt. No. 52, at 7:7–11, but these are not definitional and do not contradict the patent's clear recognition of the attributes of a "file."

Microsoft's proposed definition also reflects the way that "file" was defined and commonly used in technical references at the time the patent was filed. The *Microsoft Computer Dictionary*, which Emblaze itself cites in its claim construction statement as extrinsic evidence for the construction of this term, confirms that a "file" is "a ***named*** collection of information" and "the basic unit of ***storage*** that enables a computer to distinguish one set of information from another." Ex. C, at 211 (definition of "file") (emphasis added). A file's "name" is the "set of letters, numbers, and allowable symbols assigned to the file to distinguish it from all other files in a particular directory on a disk." *Id.* at 212 (definition of "file name"). Files are stored on disk (or modern equivalents thereof, like solid state flash memory drives) in 'directories.' *Id.* at 162 (defining 'directory' as a 'catalog for filenames and other directories stored on disk' and 'a way

of organizing and grouping . . . files'). A list of the various files and directories stored on a computer's disk are maintained in a "file system." *Id.* at 213 (defining the operating system's 'file system' as "the overall structure in which files are named, stored, and organized. A file system consists of files, directories, or folders, and the information needed to locate and access those items . . . ."). All of these definitions support the common understanding of a "file" as a collection of data that is named and stored in a directory on disk. Similarly, the *Webster's New World Dictionary of Computer Terms* (6th ed. 1977) starts its definition as: "A *document* or other collection of information **stored** on a disk and identified as a unit by a unique **name**."[2] Ex. F, at 194 (some emphasis added). The definition goes on to describe how files are organized in directory structures, exactly as the *Microsoft Computer Dictionary* does. No dictionary presented to the Court suggests that Emblaze's proposed "slice of data with a file descriptor" is a sufficient definition for "file." Emblaze's proposed construction provides no assistance to this Court or to a jury in making critical and necessary distinctions between a file and any other discrete data segment.

More importantly, Emblaze's proposed construction is inconsistent with the patent's clear distinction between preferred multiple-file and alternative single-file embodiments. The specification describes two distinct embodiments for streaming the "segments or slices" to the client:

> Preferably, each segment or slice is contained in a separate, respective file. Alternatively, the segments or slices may all be contained in a single indexed file, which is streamed to the client in a series of packets, each covering a range of one or more indices. HTTP version **1.1** supports this sort of file streaming. Other protocols may also be used for this purpose.

'473 patent at 2:22–26. The "preferabl[e]" approach stores each slice in a "separate, respective file." *Id.* This is the approach recited in all the claims: "encoding the slices in a corresponding sequence of files." *Id.* at 14:26. The "alternative" approach places the slices in a single file, rather than "separate respective file[s]," and they are "streamed to the client in a series of packets, each

___

---

[2] During exchange of proposed constructions, Emblaze offered a definition drawn from the 5th edition of this dictionary. However, because the 5th edition was published in 1994, it is less relevant than the 6th edition, which was published in 1997, the year before the patent was filed in the U.S.

___

___

___

covering a range of one or more indices." *Id.* at 2:23–25. These indices are presumably "file

descriptors" since the index for each slice describes its temporal characteristic and order in

relation to other slices. *See infra* at § II.G. Therefore, under Emblaze's construction, each indexed

slice could be considered a file, and the "single indexed file" would become a "sequence of files."

Thus, Emblaze's construction eliminates the patent's distinction between the preferred and

alternative embodiments—the slices of the alternative embodiment, because they have indices,

would constitute multiple files, exactly like the slices in the preferred embodiment.

   Emblaze's definition is thus designed to impermissibly encompass claim scope that

Emblaze surrendered when it drafted its claims. *Johnson & Johnston Associates Inc. v. R.E. Serv.*

*Co., Inc.*, 285 F.3d 1046, 1054 (Fed. Cir. 2002) ("[W]hen a patent drafter discloses but declines to

claim subject matter . . . , this action dedicates that unclaimed subject matter to the public."). The

patent claims only the embodiment that uses a "corresponding sequence of files," not the one in

which a sequence of slices is stored in a "single indexed file." *Id.* at 14:24–26, 15:66–16:2.

Construing "file" to allow the "single file" embodiment to encompass a "sequence of files,"

would broaden the '473 claims to capture the unclaimed embodiment. *Moore U.S.A., Inc. v.*

*Standard Register Co.*, 229 F.3d 1091, 1107 (Fed. Cir. 2000) (quotation omitted) ("Having fully

disclosed two distinct embodiments . . . , [the patentee] is not entitled to enforce the unclaimed

embodiment as an equivalent of the one that was claimed."). This would undermine the critical

public notice function that the claims provide. *Johnson & Johnston*, 285 F.3d at 1052

("Consistent with its scope definition and notice functions, the claim requirement presupposes

that a patent applicant defines his invention in the claims, not in the specification.").[3]

---

[3] Emblaze argues at several points that the claims must encompass all disclosed embodiments.
This is an incorrect statement of the law, particularly where stretching the claim to cover a specific
embodiment would contradict the language of the claims and specification. *TIP Systems, LLC v. Phillips &*
*Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008) (rejecting argument that claim could not be
construed in a manner inconsistent with an alternative embodiment disclosed in the specification: "[T]o
construe the claim term to encompass the alternative embodiment in this case would contradict the
language of the claims. . . . *Our precedent is replete with examples of subject matter that is included in*
*the specification, but is not claimed*.") (emphasis added); *Intamin Ltd. v. Magnetar Technologies Corp.*,
483 F.3d 1328, 1337 (Fed. Cir. 2007) ("[T]his court has acknowledged that a claim need not cover all
embodiments. A patentee may draft different claims to cover different embodiments." — rejecting
patentee's argument that claim construction was incorrect because it would not read on some disclosed
embodiments).

MICROSOFT CORPORATION'S RESPONSIVE
CLAIM CONSTRUCTION BRIEF
CASE NO. 3:12-cv-05422-JST

1      **Impact Statement:**

2      If "file" is construed to refer to data stored in a directory with a unique file name,

3 Microsoft's products do not infringe the claims as they employ the disclaimed "single file"

4 approach. Microsoft's developers considered both of the alternatives identified in the patent. They

5 experimented with the "sequence of files" method, building initial versions of the system that

6 created thousands of files with two seconds worth of data. Ex. K, *Smooth Streaming Technical*

7 *Overview* (2009) at 8–9. However they ultimately rejected this approach, in part because it

8 necessitated management of "millions of tiny files." *Id.* Based on this experience, when Microsoft

9 commercialized its Smooth Streaming products they were designed to store multimedia data as a

10 single large file. *Id.* at 9 The single file contains top-level metadata describing the video and

11 audio stream, and a series of fragments, each containing video and/or audio data for a short

12 portion of the overall stream. *Id.* Critically, the Smooth Streaming data fragments, unlike files, are

13 not separately stored under different file names. Instead the video to be streamed is "recorded in

14 full length to the disk [on the server] as a single file." *Id.* at 11. When a client requests video, the

15 Smooth Streaming server finds the relevant data in this single file, "lifts the fragment out of the

16 file and sends it over the wire to the client." *Id.* at 12. This mode of operation mirrors the

17 unclaimed alternate embodiment that the patent describes, in which "the segments or slices [are]

18 contained in a single indexed file, which is streamed to the client in a series of packets . . . ." '473

19 patent at 2:23–25.

20      In August 2010, when Emblaze approached Microsoft about this patent (but several years

21 before this case was filed), Microsoft explained to Emblaze in detail its use of the single file

22 approach and that Microsoft's Smooth Streaming literature distinguished and disparaged the

23 multiple files approach claimed by the '473 patent. Emblaze's construction of "file" is intended to

24 obliterate the single-file / multiple-files dichotomy that both the '473 patent, *id.* at 2:22–27, and

25 Microsoft's engineers identified as critical but as to which they reached opposite conclusions. If

26 any data object associated in some manner with a "descriptor" is a "file," as Emblaze now

27 proposes, then any slice of data within Emblaze's "single indexed file," *id.* at 2:24, or within

28 Microsoft's single file, will itself constitute a "file" and the distinction drawn so clearly in the

MICROSOFT CORPORATION'S RESPONSIVE
CLAIM CONSTRUCTION BRIEF
CASE NO. 3:12-cv-05422-JST

patent specification and mirrored in the claims will be nullified. This attempt to recapture what the patent clearly identifies as an alternative embodiment, but does not claim, must be rejected. *Johnson & Johnston*, 285 F.3d at 1054.

**B.    "a data rate" (Term 2)**

|  | **Emblaze** | **Microsoft** |
|---|---|---|
| "data rate" (claims 1, 8, 25, 26) | "an amount of data per unit of time" | "an amount of data (i.e. number of bits) per unit of time" |

The dispute here is about whether the amount of data should be measured in numbers of bits or if the door should be left open to other unspecified metrics including those that have no relationship to the volume of data transmitted.

The ordinary measure of data that most people are familiar with is the bit, or the byte, a grouping of 8 bits. The dictionaries cited by the parties are unanimous in the view that data rates are measured in terms of number of bits (or bytes) per second. The *Microsoft Computer Dictionary*, relied on by Emblaze, states that data rate is "usually measured in bits per second (bps)," Ex. C, at 144, and *Hargrave's Computer Dictionary*, Ex. D, at 139, agrees. Emblaze itself explained to the *Apple* court during claim construction in that case that the "data stream having a given data rate" in claim 1 refers to a stream with an "assigned" data rate so that, when the stream is cut into slices of known duration, this will "fix the amount of **bits** in the slice." Ex. H, *Emblaze v. Apple* Claim Construction Hearing Transcript at 62:17–63:7, 77:17–25.

The patent specification is consistent with this understanding. When the patent refers to "data rate," it is concerned with selecting a data rate for the encoded data stream that reflects available link bandwidths. *See, e.g.*, '473 patent at 3:5–13 (adapt "data transfer rate" to measured link bandwidth), 9:36–40 (greater volume of data across links with higher "data rates"), 11:9–22. Since link "bandwidth" is measured by the total number of bits or bytes that can be carried across a link in a second, see Ex. C, *Microsoft Computer Dictionary* at 144; Villegas Decl. Ex. E, at 1:23–26, the references to "data rate" must also relate to the total number of bits per second.

Emblaze now proposes a construction that drops the precision of bits or bytes to allow "data rate" to be measured by the transfer rate of data structures of undefined or varying size,

such as "frames" or "chunks." This would defeat the purpose for which the claims introduce

discussion of data rates in the first place. The claims require a "given data rate," and Emblaze

argues that "given" means "specified" or "not a product of happenstance." Dkt. 52 at 12. The rate

is "specified" so that it can be made to match the observed upload data rate in order that the data

generated by the transmitting computer will occupy as much of the uplink bandwidth as possible.

*See id.* at 14:28–29 (claims says "given data rate" is to be made "generally equal to" upload rate);

*see also id.* at 3:14–24, 7:45–49, 11:42–48. However, if the uplink bandwidth and the data rate

are compared using some unit (e.g., a frame) that does not have a consistent volumetric value, the

comparison will not serve the purpose of ensuring that the uplink bandwidth is used fully. The

frames that the transmitting computer is generating may be smaller, or even worse larger, than the

frames that were carried across the uplink when it was measured. In either event the result will be

a mismatch. This is like comparing the mass of two persons by weighing them using stones, then

comparing the number of stones. The comparison will be valid only if the stones all have

equivalent mass, in which case the mass could have been compared using a traditional measure

(e.g., pounds or kilograms). Likewise, a data rate measured in terms of things that do not contain

a predictable number of bits (e.g., frames ) will not produce a predictable number of bits per slice,

which means that control over this type of "data rate" could not be used to match the quantity of

generated data to the uplink bandwidth, defeating the recited goal of the patent.

Emblaze's footnote 16 provides a long list of types of data rates that it says are

contemplated by the patent but precluded by Microsoft's definition. Ironically, Emblaze's

examples reaffirm how fundamental bits or bytes are to establishing a quantity of data. Rates

measured in kilobytes per minute or 16 bits / sample at a rate of 8K samples per second, as in

Emblaze's proposals (a) and (g), are examples of rates given in bits or bytes per unit of time and

are consistent with Microsoft's definition. Emblaze's proposals (b)–(f) all involve rates that can

be measured in bits or bytes but move in a range of values or around an average. These do not

challenge the notion that bits or bytes are the suitable measure of the amount of data, but rather

how precise the equivalence between the measured upload data rate and the generated data rate of

MICROSOFT CORPORATION'S RESPONSIVE
CLAIM CONSTRUCTION BRIEF
CASE NO. 3:12-cv-05422-JST

the stream must be. This is a question of interpretation of the "generally equal" requirement that appears in the claims, not an objection to using bits or bytes as the metric of comparison.

## C.     "a data stream having a given data rate" (Term 3)

|  | Emblaze | Microsoft |
|---|---|---|
| "a data stream having a given data rate" (claims 1, 25) | "a data stream having a given amount of data per unit of time" | "a data sequence with a uniform data rate" |

The dispute here is whether the claim requirement that a data stream have a "given" data rate requires that the stream have a single, uniform data rate or whether the data rate can vary arbitrarily over the course of the stream. Emblaze takes the position that "given" indicates that the data rate is controlled, "specified," or "not a product of happenstance," Dkt. 52, and Microsoft agrees with that definition as far as it goes. (Since Emblaze has clarified that "given" implies control, Microsoft believes it would be appropriate to include "specified" or "controlled" or "assigned" in Emblaze's definition in place of "given.") The actual dispute turns on how that control is exercised. Microsoft contends that the encoded data stream must have a uniform data rate — that is, the amount of data generated per unit of time should be consistent across the stream. Microsoft does not contend that the data rate cannot be altered, but rather that when a specific data rate is assigned that the resulting stream should reflect that rate consistently.

The reason for this is simple, and Emblaze itself has pointed to it in its briefing in this case and in its argument before Judge Grewal. The patent teaches that the transmitting computer controls the amount of data in each slice by controlling two variables: the compression ratio (i.e., the ratio between the uncompressed video stream and the data rate of the compressed stream, *see* '473 patent at 11:28–33) and the duration of the slice. *Id.* at 11:40–12:17, Fig. 7. In order to use the duration of the slice to reliably produce slices with a specific number of bits (or bytes), the density (rate) of the compressed data must be uniform. As Emblaze told Judge Grewal:

> One of the key things about this patent is you have to have the assigned data rate. . . . [W]e all know the basic equation, rate equals data per unit of time. So if you know the rate, you've given yourself a given rate as the claim calls for, and you know the duration of the slice, then by definition, . . . you fix the amount of bits in that slice, because there's only three variables in that equation and now you've set two of them.

Ex. H, at 62–63. Emblaze repeated this argument several times in the hearing and its subsequent briefing, and even provided a specific example: "I've given [the data stream] a data rate. You can say 'I'm going to slice it for two seconds,' so if it's 100 kilobytes per second and it's a two second slice, I know it's going to be 200 kilobytes." *Id.* at 62–63, 74, 77, 85; Ex. J, at 1, 5. These arguments all presume that the data rate of the stream is uniform — if it were not, slicing the sequence into segments of equal duration would not necessarily result in slices of equal size. Emblaze's statements to Judge Grewal make clear that for a data stream to have a "given" data rate, it must have a known, uniform rate such that "if . . . you know the duration of the slice, then by definition . . . you fix the amount of bits in that slice."

Emblaze argues against a "uniform" data rate by pointing out that the data rate, though "specified," can be changed. Microsoft agrees entirely with the proposition that the "given" data rate can be controlled to multiple different values at different times. Microsoft's construction is not intended to suggest that the compressed data rate is unchangeable, only that those sections of the stream that are produced at a specific "given data rate" must have that uniform rate.

Emblaze's construction would actually read out of the claims the limitations requiring that the upload and download rates be equal to the "given data rate." Under Emblaze's construction of "given," as long as any data rate assigned to the stream at some point matched the upload or download rate at some point, the rate-matching limitations would arguably be met. Yet the specification describes as a core feature of the invention the various techniques the patent uses to return the data rates to equivalence, such as changing the extent of compression and dropping slow data links. *See id.* at 3:14–24, 5:7–14, 9:30–44, 11:39–48. Under Emblaze's construction, none of this is necessary to the invention as claimed, and the claimed data-rate matching feature is rendered a trivial or null aspect of the method. Thus, to be consistent with the rate-matching feature so central to the preferred embodiment, the "given data rate" must be consistent over a sequence until, as the patent describes, a disparity is detected and steps are taken to again match the rates.

## D.    "providing at the transmitting computer a data stream" (Term 4)

| | Emblaze | Microsoft |
|---|---|---|
| "providing at the transmitting computer a data stream [having a given data rate]" (claim 1) | "the transmitting computer provides a data stream having a given amount of date per unit of time" | "the transmitting computer provides a data stream for slicing" [having a given data rate] |

The dispute here is about where in the recited process the "providing" occurs. Microsoft's construction requires that the recited data stream must be provided as an input to the "slicing" step, the first transformative step in the processes described in claim 1. Emblaze's claim construction would permit the "providing" to occur at the conclusion of the other steps recited in claim 1.

There are several reasons that "providing at" should be read as referring to providing input data to the "dividing" and "encoding" steps rather than as providing an output. As a structural matter, the "providing" limitation appears first in the claim and the "data stream" that is "provid[ed]" in this step is the same element the next step acts upon, "dividing *the stream* into a sequence of slices." '473 patent at 14:22–25 (emphasis added). Accordingly, the claim describes a physical sequence that temporally orders the steps of the method. *E-Pass Technologies, Inc. v. 3Com Corp.*, 473 F.3d 1213, 1222 (Fed. Cir. 2007) ("Substantively, because the language of most of the steps of its method claim refer to the completed results of the prior step, . . . all of those steps [must be] performed in order"). Furthermore, the claim already contains a step reciting "uploading the sequence to a server," '473 patent at 14:28, that describes the disposition of the same stream after it has been sliced and encoded and organized into a <u>sequence</u> of files in accordance with the recited method steps. It would be nonsensical for the claim to include two different "output" steps: one that specifies that the data stream is transferred to a server, *id.* at 14:28–32, and a second additional step, as Emblaze proposes, that recites that the stream is "provided" without specifying to whom or for what purpose the stream is provided. *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003) (Courts must first "look to the claim language to determine if, as a matter of logic or grammar, [the method steps] must be performed in the order written.").

Emblaze claims that placing the "providing" step at the beginning of the encoding process renders either it or the "dividing" step superfluous. This argument makes no sense. Microsoft does not claim that "providing" is equivalent to "dividing." The "providing" step refers to the origination of the stream, which "comprises multimedia data captured or generated by the transmitting computer." '473 patent at 2:30–32. The "providing" step, therefore, corresponds to this act of generation or capture by which the transmitting computer obtains the stream, which is then divided and encoded in the following step. In Microsoft's construction, "providing" does not supplant any other step.

### E.  "predetermined data size" (Terms 5 & 6)

| | Emblaze | Microsoft |
|---|---|---|
| "each slice having a predetermined data size associated therewith" (claims 1, 25) | "each slice having a data size, which may be established by setting a time duration of the slice, assigned in advance of the stream being divided" | "each slice having a data size (i.e. number of bits) assigned in advance of the slice[4] the stream being encoded." (A slice's data size may be assigned by assigning a time duration that would necessarily produce a slice of a certain data size given the data rate of the stream.) |
| "wherein dividing the stream into the sequence of slices comprises dividing the stream into a sequence of time slices, each having a predetermined duration associated therewith" (claim 23) "wherein the predetermined data size of each of the slices corresponds to a time duration of the slice (claim 37) | "the stream is divided into a sequence of slices, where the predetermined data size of the slices is established by setting the time duration of the slices" | "the stream is divided into a sequence of slices, where the predetermined data size of a slice is established by assigning a time duration that would necessarily produce a slice of a certain data size given the data rate of the stream" |

The dispute here is about whether "data size" is a number of bits, as Microsoft contends, or if it can also refer to a time duration, as Emblaze proposes. Ordinary usage requires that the "size" of an amount of data is the number of bits or bytes of the data. The patent consistently uses "data size" to refer to the volume of data and associates adjusting the "data size" of the slice with

---

[4] Microsoft originally proposed the construction "assigned in advance of the stream being encoded" with the intention that this be understood to mean that before any given part of the stream was encoded the "data size" of the encoded result was established. Microsoft did not intend to suggest that adjustments in the target data size could not be made once any part of the stream had been encoded. To make its meaning clearer Microsoft has substituted "the slice" for "the stream" in its proposed construction.

-15-          MICROSOFT CORPORATION'S RESPONSIVE
CLAIM CONSTRUCTION BRIEF
CASE NO. 3:12-cv-05422-JST

changing the level of compression, which changes the number of bits but not the length (in time) of the slice. *See, e.g.*, '473 patent at 4:39–43, 5:15–18, 9:1–5. In contrast, the patent uses "duration" when referring to an amount of data that extends over a certain period of time. *See, e.g.*, *id.* at 3:42, 5:35, 8:53, 9:35, 11:53, 11:55, 12:3, 12:7, 12:10, 12:15, 13:5, 13:11, 13:15, 13:23. The same distinction is drawn in the claims. Claims 11 and 40 refer to the different "data sizes" of slices subject to different levels of "encoding" (i.e., compression). These slices have the same time duration, but different numbers of bytes. Claim 23 further uses "duration" when referring to an amount of time.

Emblaze argues against the idea that a "predetermined data size" must involve an assigned number of bits by pointing out that the patent describes that the transmitting computer adjusts the level of compression used from slice to slice in order to "adjust the data streaming rate to the available bandwidth." *Id.* at 7:45–49; *see also id.* at 4:63–67. This feature affirms rather than rebuts Microsoft's construction. Microsoft does not contend that "predetermined" means set to one value for all time. Rather, Microsoft asks that "predetermined" be construed as "assigned in advance of the slice being encoded." The passages that Emblaze itself cites, and others, clearly demonstrate that the transmitting computer is to encode data with the goal of producing encoded data slices of a certain data size. *Id.* at 3:18–24, 4:39–43,[5] 4:63–67, 5:15–18. The encoder cannot produce those slices unless it knows in advance at what size it is trying to produce. Figure 7 clearly shows that the patent sets the target compression ratio before it begins compressing the data. *Id.* at 11:23–26, Fig. 7.

Emblaze also argues based on claim 37 and the passage at 5:33–35, which refer to a "correspondence" between the data size and time duration of a slice. Correspondence, however, only indicates that there is a relationship between duration and data size, not that they are equivalent. The relationship between data size and time duration is the degree of compression, or quality level, which, as Emblaze has demonstrated, the transmitting computer controls and may

[5] The patent contemplates an embodiment where the encoder produces multiple files, each at a different quality level, for each time slice. '473 patent at 4:39–43, 5:15–18. In this arrangement, as described in claim 11, the encoder produces multiple slices, each of which has a "different, respective data size." *Id.* at 15:11.

 MICROSOFT CORPORATION'S RESPONSIVE CLAIM CONSTRUCTION BRIEF CASE NO. 3:12-cv-05422-JST

adjust. *Id.* at 3:14–24, 4:63–67, 7:45–49, 10:19–22, 11:45–48. In the Apple case, Emblaze

explained this exact relationship to Magistrate Grewal: "'data size' and 'time duration' are not the

same thing, but, rather, are related variables in the following equation: data rate (e.g.

kilobytes/sec) multiplied by time (e.g. seconds) equals data size (e.g. kilobytes)." Ex. J, at 1.

Claim 37, therefore, refers to the fact that the data size of the slice can be changed by adjusting

the slice duration. It does not imply that data size and slice duration are equivalents or

interchangeable as Emblaze proposes.

　　　　Emblaze's final argument is that Microsoft's construction, which refers to assigning a data

size in advance of encoding, is at odds with the order of operations shown in Figure 5 and at

9:66–67. The problem for Emblaze is that claims 1 and 25, which recite "divid[ing] the stream

into a sequence of slices" followed by "encod[ing] the slices" follow the same order of operations

that Emblaze claims is contrary to the teachings of the patent. Furthermore, Figure 9, which

details the elements of the CHECK LINK step 88 that is performed in Figure 5 at the conclusion

of each slicing operation, *id.* at 12:59–61, indicates that the transmitting computer adjusts the

compression and slice duration for the next slice of data before it commences either slicing or

encoding that data. *Id.* at 13:11–30. The patent specification, therefore, agrees with Microsoft that

the slice data size is assigned in advance of encoding.

**F.　　"encoding the slices" (Terms 7, 8 & 9)**

| | **Emblaze** | **Microsoft** |
|---|---|---|
| "encoding the slices in a corresponding sequence of files" (claim 1) "encodes the slices in a corresponding sequence of files" (claim 25) | "forming each slice as a file, wherein a file includes compressed data from the slice and a file descriptor, and wherein the sequence of files corresponds to the sequence of slices" | "compressing the data from each slice and saving the compressed data from each slice into a file corresponding to that one slice" |
| "encoding slices in a plurality of different quality levels" (claim 11) "slices are encoded at a plurality of different quality levels" (claim 40) | "forming slices at more than one quality level" | "compressing the slices from the data stream at more than one quality level" |
| "decode the sequence" (claims 8, 26) | "decompressing any compressed data in the sequence" | "decompressing compressed data in the sequence" |

The dispute here is about whether "encoding," as used in the patent, necessitates "compressing." Microsoft contends that it does. Emblaze contends that there are two types of encoding: "encoding the stream," which Emblaze concedes involves compression, and "encoding slices," which Emblaze claims does not. This idea defies logic as "slices" are simply fragments of the larger stream so there is no reason to believe that encoding one would be different than encoding the other. In fact, the patent draws no such distinction.

Emblaze concedes that the patent includes multiple passages equating encoding with compression. *See id.* at 11:26–28 ("In encoding data stream 40, computer 34 preferably compresses the data using any suitable compression method known in the art."). Figure 7, which "schematically illustrates details of encoding step 80 and slicing step 82," *id.* at 11:23–24, includes steps labeled "SET COMPRESSION RATIO" and "COMPRESS DATA" as subparts of "encoding step 80." Indeed, the patent uses encoding and compressing interchangeably when characterizing step 80 in Figures 5 and 7. In Figure 5 and at 11:24 and 13:25, step 80 is characterized as an "encoding" step, whereas, in Figure 7 and 9:66-67, it is described as the step where data is "compressed." Similarly, at 10:20 encoding and quality level adjustment (i.e., compression) are equated ("encoding/quality level (step 80) . . . may be adjusted").

Moreover, Emblaze's claim that there are no passages associating encoding a "slice" with compression is false. For example, the patent refers to "encoding slices at a plurality of different quality levels." *Id.* at 4:39–43. Encoding slices at different quality levels implies compression, since it is the degree of compression that produces different quality levels, as the patent clearly states. *Id.* at 3:5–8.

Furthermore there is no reason to believe that the patent would draw a distinction *sotto voce* between "encoding the stream" and "encoding a slice," because the '473 system is addressed to "real-time" (i.e., live) streaming, *id.* at 1:12, 13:46–49, and therefore cannot and does not wait for the conclusion of the stream to encode the entire stream as a single complete entity. Instead, the transmitting computer slices, encodes, and transmits the individual chunks or slices of the stream as soon as they are available and repeats these operations on each new slice until the stream terminates. *Id.* at 9:62–10:5, 11:22–23. There is, therefore, no such thing in the patent as

"encoding a stream" that is separate and distinct from "encoding slices," and no disclosure of

encoding the stream as a whole. Any reference in the patent to "encoding a stream" is only

shorthand for encoding the sequence of individual slices, and Emblaze's distinction between the

two is entirely artificial.

Finally, Emblaze's construction should be rejected because it contravenes the principles of

claim construction. Claim terms like "encoding" are to be read in light of the specification.

*Philips*, 415 F.3d at 1315 ("[T]he specification is always highly relevant to the claim construction

analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.")

(quotations omitted). Figure 5, which the patent characterizes as "an overview of operations of

computer 34," '473 patent at 9:53–56, only shows one "encoding" step, and Emblaze concedes

that this step includes compression. Emblaze insists that its second non-compressing "encoding"

step is revealed at 12:1–2, which refers to "file 44 (slice 2) . . . being encoded and prepared," but

there is no reason to read this as describing anything other than that the data in slice 2 is

undergoing the operations 80 (encoding), 82 (slicing), and 84 (FTP upload) actually illustrated in

Figure 5 (to which the quoted language pertains). Unless the specification demands otherwise,

which this passage does not, patents should be assumed to use claim terms like "encoding"

consistently. *PODS, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359, 1366 (Fed. Cir. 2007)

The parties' constructions also differ in the language used to describe the correspondence

between slices and files. Microsoft's construction is intended to indicate that there is a one-to-one

correspondence between slices and files, as described in the patent. '473 patent at 7:27–29

("Computer 34 stores each slice as a corresponding file . . . .").

**G.     "each file having a respective index" (Term 10)**

| | Emblaze | Microsoft |
|---|---|---|
| "sequence of files, each file having a respective index" (claims 1, 25) | "sequence of files, wherein each file has an indicator that represents a respective slice's location in the sequence" | "sequence of files, wherein each file has an index from a running slice index 1, 2, 3 … N indicating its location in the sequence" |

The dispute here is about whether a file index is an integer drawn from the set 1, 2, 3 … N

or any value that serves as an "indicator" of the slice's location in the sequence of slices.

The patent describes that the "[c]omputer 34 stores each slice as a corresponding file, having a running slice index 1, 2, 3 … N." *Id.* at 7:27–28 (ellipsis in original). At any given moment the largest index "N is the index of the most recent slice." *Id.* at 8:23–26. This is the only description in the patent of the value of the index. Nowhere does the patent propose an alternative definition or that the index might only "represent[] a respective slice's location in the sequence," as Emblaze's definition proposes.

The fact that the slice indices increase predictably by a value of one is necessary to enable an important feature of the invention. The patent describes that the client reads the current maximum index value ("N") from the index file on the server. *Id.* at 8:32–34. The client can then begin retrieving and playing slice files starting at the "N" file, *id.* at 8:34–36, or, alternatively, at an earlier index value, *id.* at 8:36–41. This is only possible if the client is able to determine what those earlier index values from the value of "N" because the index values have a predictable relationship with each other, as each new index has a value of +1 more than the next.

Emblaze argues that the "respective index" of each file might be a presentation time stamp (PTS), *id.* at 8:49, but nowhere does the patent describe using a PTS as a means of identifying a file. Contrary to Emblaze's argument, there is no PTS-based embodiment described in the patent that Microsoft's construction would exclude. Furthermore, Emblaze's system is not adapted to use timestamps for this purpose. The patent describes that file slice durations may vary, *id.* at 7:42–45, which means that there is no fixed relationship between the PTS values in consecutive slices and no rule comparable to the +1 rule for integer index values that can be used to calculate an earlier PTS from another PTS. Since the patent describes that users must be able to calculate earlier index values from one supplied index, and claim 10 recites this feature, it is clear why the '473 patent did not propose PTS timestamps for use as file indexes.

## H. "uploading the sequence" (Term 11)

|  | Emblaze | Microsoft |
|---|---|---|
| "uploading the sequence to a server at an upload rate generally equal to the data rate of the stream (claim 1) | "transmitting the files from the transmitting computer to the server at an upload rate generally equal to the data rate of the stream" | "uploading the sequence from the transmitting computer to the server at a data rate that is generally equal at all points in time to the data rate of the |

| "uploads the sequence to a server at an upload rate generally equal to the data rate" (claim 25) | | "stream" |
| --- | --- | --- |

This claim language describes one of the key features of Emblaze's invention. The '473 system dynamically adjusts the data rate of the encoded stream to "match" the upload rate. *Id.* at 11:45–48. This allowed it to take maximal advantage of the bandwidth available from the slow-speed Internet connections available in 1998, *see id.* at 3:14–24, 7:45–49, and enabled Emblaze to substitute low speed Internet connections for the "high-speed data links" required by the prior art, *see* 1:40–45, 6:36–38. High speed Internet connections are now commonplace and modern encoders assume the existence of a high bandwidth network uplink. In particular, Microsoft's accused software does not attempt to match the data rate of the encoded data it generates to the bandwidth available on the user's network uplink.

The claim construction dispute between the parties turns on how the "upload rate" is to be measured to determine if it is "generally equal" to the data rate of the encoded media stream. Microsoft believes that "upload rate" should be interpreted as the actual rate at which data is uploaded, ***measured during the period while data is being uploaded***. Emblaze wants a construction that will allow it to compare average rates over the entire time duration of the slices, which involves a long window of inactivity relative to the period of actual data transfer. To understand the difference between these positions, consider a hypothetical encoder that generates an encoded data stream at a rate of 30 Kbytes/sec and slices this stream every 2 seconds. The encoder then uploads these 60 Kbyte slices to the server across an Internet link at an upload rate of 600 Kbytes/sec. This takes 0.1 second, so for the following 1.9 seconds (until the next slice is generated) there is no data transmission; the link is idle for 95% of the slice transmission period. The actual available upload rate in this scenario is 600 Kbytes/sec, but Emblaze wants to calculate the upload rate as a time-weighted average of the 600 Kbytes/sec rate used during the 0.1 seconds data was actually being sent and 0



-21-

Kbytes/sec for the 1.9 seconds when there was no data transmission, producing an average available "rate" of 30 Kbytes/sec. This allows Emblaze to make the misleading claim that the resulting "rate" was precisely equal to the data rate of the encoded stream, even though the upload link was operating at twenty times that rate.

The patent makes clear that the purpose of measuring the upload rate is to determine the data carrying capacity of the uplink. *See id.* at 3:14–18 (the "known or estimated bandwidth of the uplink"), 7:45–49 (the "***available*** bandwidth") (emphasis added). After measuring the available uplink bandwidth the transmitting computer maximizes the quality of the encoded data stream by "compress[ing] the data stream at a compression ratio that is adjusted so as to match the data stream bandwidth to the available link bandwidth." *Id.* at 3:18–24; *see also id.* at 7:45–49, 11:45–48.[6] The patent, therefore, is consistent with Microsoft's construction that requires comparison of the data rate of the stream to the upload data rate *while the data is being transmitted* (i.e., "the available link bandwidth.") *Id.* at 3:21. Emblaze's proposed average, on the other hand, measures how much *data was transferred*, not how much *bandwidth was available*.

Emblaze's construction is at odds with the plain meaning of the terms. The ordinary meaning of "upload rate" is the rate at which data can be uploaded. The patent makes clear that the upload rate "will fluctuate" based on the vagaries of the data connection. *Id.* at 11:65–67; *see also id.* at 9:13–17, 10:55–63, 12:36–40. Accordingly, the patent teaches that the transmitting computer should encode slices at a rate so that the "[upload] data rate should be generally equal to or faster than the rate at which the data are generated." *Id.* at 2:57–59. Under Emblaze's construction, this passage is nonsensical as an upload rate "generally . . . faster" than the data generation rate would require the impossibility that the transmitting computer upload more data than it created — that is the only way that the *average* rate of data upload, calculated in hindsight, could exceed the average rate of the encoded data stream. In contrast, under Microsoft's construction this passage has a perfectly sensible meaning. If the transmitting computer measures

---

[6] The patent also teaches the possibility of adding new uplinks to increase the total upload rate. '473 patent at 3:51–59. This is, of course, only a possibility when multiple uplink connections are used to carry the encoded data. The patent teaches that both one link or connections composed from multiple links are possible, *id.* at 9:49–52, and the asserted claims do not specify either of these embodiments.

the bandwidth obtained on the uplink, *see, e.g.*, 3:14–24, 7:36–42, and discovers that it is able to upload data at a rate, for example, of 2Kbyte/sec, it can either compress the data to produce a data stream having a "generally equal" rate of approximately 2Kbyte/sec, *id.* at 11:65–67, or it can leave a safety margin and produce a data stream at a lesser rate such as 1.5Kbyte/sec. If, as Microsoft contends, the "upload rate" is the available bandwidth (i.e., the rate at which data can be transferred while there is an active transfer), the value of the "upload rate" will be 2Kbytes/sec and it will be "generally … faster" than the data rate (1.5Kbytes/sec) at which the transmitting computer encodes the data stream. Of course the "generally faster" option was not included in the claims, which instead explicitly require that the stream data rate and upload rate be "generally equal." *Id.* at 14:29, 16:7–8.

The patent's description of how the uplink data rate is to be measured provides further evidence that the "upload rate" refers to the available bandwidth on the uplink. The '473 patent teaches that uplink performance is measured by how much time it takes to transmit each slice ($T_{SL}$). *Id.* at 12:61–13:15; *see also* 2:51–56. The transmit time moves in inverse relationship to the uplink bandwidth: as the upload data rate increases, the transmit time decreases. The patent describes that the upload transmit time should be compared against the slice duration. *Id.* at 13:7–11. If the upload time is shorter than the slice duration (i.e., the upload rate is faster than the data rate of the stream), the compression ratio may be decreased, *id.* at 12:13–17, increasing the amount of encoded data in the stream. If the upload time is longer (i.e., the upload rate is slower than the data rate), the compression ratio should be increased. *Id.* at 13:11–15. If the upload time is generally equal to the slice interval, then the upload rate is generally equal to the data rate and no adjustment is required. Measuring the transmit interval gives the transmitting computer an indication of the available upload bandwidth, calculated *over that transmit interval*. As a matter of definition, the transmit time $T_{SL}$ does ***not*** measure the portion of the slice interval that the transmitting computer was not sending any data and, therefore, it does ***not*** provide information about the average rate across the entire time slice.

Microsoft's inclusion of the phrase "at all points in time" in its proposed construction was intended to capture the idea that the data rate of the encoded stream must track the actual upload

rate that was achieved during the actual upload transfer. *See id.* at 3:14–23 (the data rate is to be made generally equal to the "available link bandwidth"). However the particular phraseology is not important. Any formulation that requires the upload rate and data rate of the stream to be "generally equal" while the data is being actively uploaded would be suitable.

Emblaze opposes this construction because it claims that there are disclosed embodiments which do not require the data rate and the upload rate to track. However, the '473 patent explicitly identifies adjustment of the data rate of the encoded stream to track the measured upload rate as a *preferred* or *most preferable* embodiment. *Id.* at 2:51–59, 3:14–23, 5:7–10, 11:42–48. It is, therefore, unremarkable that this requirement would appear in the claims. *Intamin Ltd. v. Magnetar Technologies Corp.*, 483 F.3d 1328, 1337 (Fed. Cir. 2007) ("[T]his court has acknowledged that a claim need not cover all embodiments. A patentee may draft different claims to cover different embodiments.").

## I. "download rate generally equal to the data rate" (Term 13)

| | Emblaze | Microsoft |
|---|---|---|
| "such that the one or more client computers can download the sequence over the network from the server at a download rate generally equal to the data rate" (claims 1, 25) | "such that one or more client computers are able to select individual files corresponding to the slices for download over the network at a download rate generally equal to the data rate" | "such that one or more client computers can received the sequence over the network from the server at a data rate that is generally equal at all points in time to the data rate of the stream" |

The dispute over this claim element is similar to the previous dispute regarding the upload link. The patent describes that a client computer assesses the "rate of data transfer" on the downlink and changes the quality level it selects from the server. *Id.* at 11:9–11. The client "may select a higher quality level to take advantage of the available bandwidth," *id.* at 11:15–18, or select a lower quality level if it is not receiving data quickly enough, *id.* at 11:11–15. As with the uplink limitation, Microsoft's construction is intended to make clear that this element requires that the client must be able to match the data rate of the selected media stream with the network download data rate as measured at a time when data is actually being downloaded (i.e., the *available bandwidth* on the downlink).

The inclusion of the concept that "client computers . . . select individual files" in Emblaze's construction is improper. The patent presents a variety of different download techniques, such as the HTTP, UDP, or RTP protocols, *id.* at 7:5–9, or multicasting, *id.* at 8:8–11. Some of these, such as HTTP, may be used to request an individual file. Others, including RTP and multicasting, do not involve a client selecting specific files. As a result this limitation should not appear in the claims.[7]

### J. Other terms (Terms 14 through 17)

| | **Emblaze** | **Microsoft** |
|---|---|---|
| "play back the data stream responsive to the indices of the files" (claim 8) | "playing back the data stream based on the indices of the files to be played back" | No construction required |
| "at a replay rate generally equal to the data rate" (claim 8) | "the rate at which the client plays back the data stream is generally equal to the data rate of the stream" | No construction required |
| "uploading and updating an index file containing the index of the file in the sequence that was most recently uploaded" (claim 9) | "uploading to a server an index filed, and updating the index file with the index of the most recently uploaded file" | No construction required |
| "determining a data bandwidth of the network between the server and the client computer" (claim 12) | "the client determines a data rate at which a client can download a file from the server" | No construction required |

In its motion papers, Emblaze identifies no dispute or ambiguity as to the phrasing of these terms as they appear in the claims. As a result, their proposed constructions resolve no identified issue and serve no purpose. Emblaze's sole rationale seems to be that Magistrate Grewal adopted these constructions in the *Apple* case after rejecting Apple's proposals. But this is not a basis to saddle this case with these ambiguous and unhelpful constructions. The proposed constructions fail to shed light on any issue or dispute in ***this case***, nor do they clarify the meaning or import of these terms. Giving them the imprimatur of judicial approval only creates opportunities for mistake and mischief. If there is no specific dispute regarding the terms as they appear in the claims, there should be no pretense of a construction when what is proffered is a non-construction.

---

[7] In the *Apple* case, Emblaze proposed a construction that the client "select[s] individual files" and Apple that the client "requests and receives each file." Both of these proposals erroneously limit claims 1 and 25 to a specific embodiment where the client computer selects claims. Neither party advocated for an appropriately restrained construction.

LEGAL27952122.3

-25-

MICROSOFT CORPORATION'S RESPONSIVE
CLAIM CONSTRUCTION BRIEF
CASE NO. 3:12-cv-05422-JST

DATED: September 25, 2013

**PERKINS COIE** LLP

By: _/s/ Eric L. Wesenberg_
    Eric L. Wesenberg
    EWesenberg@perkinscoie.com

Attorney for Defendant
MICROSOFT CORPORATION

**CERTIFICATE OF SERVICE**

    I hereby certify that on September 25, 2013, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/EMF registrants for this case.

                                */s/ Eric L. Wesenberg*
                                   Eric L. Wesenberg