1   Eric L. Wesenberg, (SBN 139696)
    EWesenberg@perkinscoie.com
2   Christopher L. Kelley (SBN 166608)
    ckelley@perkinscoie.com
3   Kenneth J. Halpern (SBN 187663)
    KHalpern@perkinscoie.com
4   PERKINS COIE LLP
    3150 Porter Drive
5   Palo Alto, CA 94304-1212
    Telephone:  650.838.4300
6   Facsimile:  650.838.4350

7   Antoine M. McNamara (SBN 261980)
    AMcNamara@perkinscoie.com
8   PERKINS COIE LLP
    1201 Third Avenue, Suite 4800
9   Seattle, WA  98101
    Telephone:  206.359.8000
10  Facsimile:  206.359.9000

11  Isabella E. Fu (SBN 154677)
    Associate General Counsel
12  Microsoft Corporation
    One Microsoft Way
13  Redmond, WA 98052
    Telephone:  425.882.8080
14  Facsimile:  425.936.7329

15  *Counsel for Defendant*
    *Microsoft Corporation*

16

# UNITED STATES DISTRICT COURT

17

## NORTHERN DISTRICT OF CALIFORNIA

18

### SAN FRANCISCO DIVISION

19

20

21  EMBLAZE LTD.,

22                      Plaintiff,

23           v.

24  MICROSOFT CORPORATION,

25                      Defendant.

26

27

28

Case No. 3:12-cv-05422-JST

**MICROSOFT CORPORATION'S MOTION TO DISQUALIFY COHEN & GRESSER LLP AS COUNSEL FOR EMBLAZE LTD.**

**ORAL ARGUMENT REQUESTED**

Date:       May 29, 2014
Time:       2:00 pm
Place:      Courtroom 9, 19th Floor
Judge:      Hon. Jon S. Tigar

# NOTICE OF MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on May 29, 2014 at 2:00 p.m. or as soon as the matter may be heard by the Honorable Jon S. Tigar in Courtroom 9, San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Microsoft Corporation ("Microsoft") will move to disqualify Cohen & Gresser LLP as counsel in this action for Plaintiff Emblaze Ltd. ("Emblaze"). This motion is based on this notice of motion and supporting memorandum of points of authorities, the supporting declaration of Eric L. Wesenberg ("Wesenberg Decl.") and exhibits attached thereto, the supporting declaration of Isabella Fu ("Fu Decl."), the supporting declaration of Kevin Sullivan ("Sullivan Decl.") and exhibits attached thereto, and such other written or oral argument as may be presented at or before the time this motion is taken under submission by the Court.

## RELIEF REQUESTED

Microsoft seeks an order disqualifying Cohen & Gresser LLP from serving as counsel for Emblaze in this action.

## STATEMENT OF ISSUES TO BE DECIDED

1.      Whether, in representing Emblaze in this matter, Cohen & Gresser LLP coordinated with and built its case against Microsoft upon the investigation and work product of Microsoft's own counsel, Cozen O'Connor, such that Cohen & Gresser's continued representation of Emblaze would perpetuate and aggravate Cozen O'Connor's violations of its duty of loyalty to Microsoft.

DATED:  April 4, 2014                    /s/ Eric L. Wesenberg
                                         Eric L. Wesenberg
                                         PERKINS COIE LLP

                                         *Counsel for Defendant*
                                         *Microsoft Corporation*

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     STATEMENT OF FACTS ................................................................................... 2

    A.   Cozen O'Connor and Davis Wright Tremaine Both Currently Represent, and Have Long Represented, Microsoft in Other Matters. ................................... 2

    B.   Attorneys now at Cozen are the Architects of Emblaze's Case Against Microsoft. .......................................................................................................... 2

    C.   Cozen O'Connor and Davis Wright Tremaine Represent Emblaze in its Suit Against Apple and Have Taken Positions Squarely Adverse to Microsoft's Interests. .................................................................................... 3

    D.   In Representing Emblaze against Microsoft, Cohen & Gresser has Substantially Relied Upon the Work of, and Coordinated With, Attorneys at Cozen O'Connor. ................................................................................... 5

III.    STATEMENT OF LAW ..................................................................................... 8

IV.     ARGUMENT ...................................................................................................... 11

    A.   Martin Pavane and the Cozen O'Connor Firm Have Violated Their Duty of Loyalty to Microsoft by Coordinating with Cohen & Gresser and Taking Actions Directly Adverse to Microsoft's Interest ................................... 12

    B.   Cohen & Gresser's Collaboration with Cozen and Reliance on Martin Pavane's Work Aided and Abetted Cozen's Breach of Its Duty of Loyalty to Microsoft. .......................................................................................... 15

    C.   Cohen & Gresser's Knowledge of Cozen's Conflict, or Lack Thereof, Does Not Affect the Disqualification Analysis ..................................................... 18

    D.   The Available Record Establishes that C&G Should Be Disqualified Unless It Can Demonstrate that Its Communications with Cozen Were so Insubstantial that Its Continued Representation Would Not Be Tainted by Cozen's Ethical Violations ......................................................................... 20

    E.   Disqualification of C&G is the Only Suitable and Appropriate Remedy ............. 21

V.      CONCLUSION ................................................................................................... 22

# TABLE OF AUTHORITIES

**Page**

CASES

*Banning Ranch Conservancy v. Superior Court,*
    193 Cal. App. 4th 903 (2011) ...................................................................................9

*Beltran v. Avon Products, Inc.,*
    867 F. Supp. 2d 1068 (C.D. Cal. 2012) .............................................................17 n.4

*Canatella v. Krieg, Keller, Reilley & Roman LLP,*
    3:11-cv-5535-WHA, 2012 WL 847493 (Mar. 13, 2012) .....................................17 n.4

*Cinema 5, Ltd. v. Cinerama, Inc.,*
    528 F.2d 1384 (2d Cir. 1976) ...................................................................................9

*Elantec Semiconductor, Inc. v. Cooper,*
    3:98-cv-03871-CRB, 1999 WL 33921316 (N.D. Cal. Mar. 10, 1999) ..............10, 17

*Enzo Biochem, Inc. v. Applera Corp.,*
    468 F. Supp. 2d 359 (D. Conn. Jan. 5, 2007) ........................................................13

*Flatt v. Superior Court,*
    9 Cal.4th 275 (1994) ...................................................................................... passim

*Fund of Funds, Ltd. v. Arthur Andersen & Co.,*
    567 F.2d 225 (2d Cir. 1977) ........................................................................... passim

*Gonzalez v. Central Electric Co-operative, Inc.,*
    2009 WL 3415235 (D. Or. Oct. 15, 2009) .............................................................20

*In re Airport Car Rental Litigation,*
    470 F. Supp. 495 (Apr. 24, 1979) .......................................................................17 n.4

*In re American Home Products Corp.,*
    985 S.W.2d 68 (Tex. 1998) ................................................................................20, 21

*In re California Canners & Growers,*
    74 B.R. 336 (Bankr. N.D. Cal. 1987) ...................................................10, 17, 19, 20

*j2 Global Communications Inc. v. Captaris Inc.,*
    2012 WL 6618272 (C.D. Cal. Dec. 19, 2012) ...................................................11, 19

*Kirk v. First American Title Insurance Co.,*
    183 Cal. App. 4th 776 (2010) ............................................................................11, 18

*Metro-Goldwyn-Mayer, Inc. v. Tracinda Corp.,*
    36 Cal. App. 4th 1832 (1995) .................................................................................10

**TABLE OF AUTHORITIES**

*Multimedia Patent Trust v. Apple Inc.*,
    2011 WL 1636928 (S.D. Cal. Apr. 29, 2011) ...................................................................13, 14

*People v. SpeeDee Oil Change Systems Inc.*,
    20 Cal.4th 1135 (1999) ............................................................................................. passim

*Rembrandt Technologies, LP v. Comcast Corp.*,
    2007 WL 470631 (E. D. Tex. Feb. 8, 2007) ............................................................................13

*Santa Clara County Counsel Attorneys Association v. Woodside*,
    7 Cal.4th 525 (1994) ..............................................................................................................9

*TransPerfect Global, Inc. v. MotionPoint Corp.*,
    4:10-cv-02590-JCS, 2012 WL 2343908 (N. D. Cal. June 20, 2012) .........................................8

*Visa U.S.A., Inc. v. First Data Corp.*,
    241 F. Supp. 2d 1100 (N. D. Cal. 2003) ............................................................................8, 12

**RULES**

California Rules of Professional Conduct, Rule 3-310(C)(3) ............................................................9

Northern District of California, Civil Local Rule 11-4 ..................................................................8

**OTHER AUTHORITIES**

ABA Formal Opinion 92-367 (Oct. 16, 1992) .............................................................................13

# I. INTRODUCTION

In a closely related case, *Emblaze v. Apple*, 5:11-cv-01079-PSG, involving the same claims of the same patent asserted against another streaming protocol, Plaintiff Emblaze Ltd. ("Emblaze") has been represented by two firms, Cozen O'Connor ("Cozen") and Davis Wright Tremaine ("DWT"), both of whom have long represented, and continue to represent, Microsoft in other matters. In litigating the *Apple* action, attorneys from those firms — and from Cozen in particular — have taken positions knowing that those positions would be squarely adverse to Microsoft's legal interests. That was done without a conflict waiver and in violation of their duty of loyalty to Microsoft as its counsel. In this case, Emblaze has been ostensibly represented by Cohen & Gresser LLP ("C&G"), but rather than insulate or screen themselves from these other firms' conflicts, C&G attorneys have directly coordinated with and built their case upon the work of Emblaze's conflicted attorneys in the *Apple* case. Indeed, from the evidence available to Microsoft, it appears that Cozen attorney Martin Pavane and other members of the Cozen firm are the primary architects of Emblaze's cases against both Apple and Microsoft. Mr. Pavane and other attorneys now at Cozen developed Emblaze's case against Microsoft and negotiated with Microsoft in advance of Emblaze filing suit; they proposed claim constructions in the *Apple* case to anticipate issues present only in Emblaze's dispute against Microsoft (most significantly, the meaning of the claim term "file"); they advised and directly coordinated with C&G attorneys about the *Microsoft* case; and, in December, Mr. Pavane himself formally appeared in this case (only to rapidly withdraw after Microsoft raised the conflict issue). C&G's representation of Emblaze is intertwined with, and inseparable from, Cozen's conflicted work on this case, and allowing C&G to continue to represent Emblaze in this matter would both perpetuate and aggravate Cozen's violations of its duty of loyalty to Microsoft. Accordingly, Microsoft moves for this Court to disqualify C&G from continuing to serve as counsel for Emblaze in this action and to prohibit any future counsel for Emblaze in this action from communicating with Cozen or DWT in any manner.

LEGAL120246768.8

## II.    STATEMENT OF FACTS

### A.    Cozen O'Connor and Davis Wright Tremaine Both Currently Represent, and Have Long Represented, Microsoft in Other Matters.

Both Cozen O'Connor and Davis Wright Tremaine have long represented Microsoft in other matters. Cozen has represented Microsoft for over 10 years and continues to do so. (Fu Decl. ¶ 1.) In particular, Cozen currently represents Microsoft on an open matter involving a Pennsylvania State Income Tax audit assessment. (*Id.*) Similarly, DWT has represented and continues to represent Microsoft on numerous matters, including several patent litigation actions. (*Id.* ¶ 2.) In just the past six years, DWT has worked on over 1400 matters for Microsoft, generating substantial bills each of these years. (*Id.*) Among these matters, several have involved issues relating to video streaming and other technologies potentially relevant to this case. (*Id.*) For example, DWT represented Microsoft on agreements with third-party content providers like Time Warner Cable and Verizon for live streaming applications on the Xbox. (*Id.*)

### B.    Attorneys now at Cozen are the Architects of Emblaze's Case Against Microsoft.

In early 2010, Emblaze commenced a public-relations and letter campaign against Microsoft and Apple predicated on allegations of infringement of its U.S. Patent No. 6,389,473 (the '473 patent). Martin Pavane, then Managing Partner of Cohen Pontani Lieberman & Pavane LLP ("Cohen Pontani") and, since July 2011, a member at Cozen, has assisted Emblaze in its campaign against both companies from the earliest days of its efforts to assert the '473 patent.

On February 10, 2010, Emblaze first publicly accused Apple and Microsoft of infringing the '473 patent. *See* Reuters, *Emblaze Says Microsoft, Apple Infringe Its Patents* (Feb. 10, 2010), *available at* http://reut.rs/1lTRMDd) (Wesenberg Decl., Ex A.) That same month, Microsoft received a letter on behalf of Emblaze from attorney Edward Weisz of Cohen Pontani (also now a member at Cozen), alleging that Microsoft's "IIS Smooth Streaming" technology read on one or more claims of the Emblaze patent. Letter from E. Weisz, Cohen Pontani, to Microsoft (Feb. 4, 2010) (Sullivan Decl. ¶ 1 & Ex. A.) That letter included a claim chart comparing Microsoft's Smooth Streaming protocol to the claim limitations of eleven claims of the '473 patent, all of which have been asserted in the current suit. *Id.*

From February 2010 until June 2011, Microsoft attorneys corresponded, by telephone and letter, with Mr. Weisz and Mr. Pavane regarding Emblaze's allegations. (Sullivan Decl. ¶ 2.) On August 9, 2010, Microsoft attorneys presented their non-infringement defenses to Mr. Pavane and Mr. Weisz in a slide presentation via video teleconference. (*Id.* ¶ 3.) On March 17, 2011, Microsoft attorneys flew to New York to meet in person with Mr. Pavane, Mr. Weisz, and other representatives of Emblaze. (*Id.* ¶ 5.) These conferences and correspondence all focused on Microsoft's non-infringement arguments, including its position that the IIS Smooth Streaming protocol, unlike Apple's competing HTTP Live Streaming technology, never includes a "sequence of files" as required by the '473 patent, but rather stores the entire video stream as fragments within a single large file. *See, e.g.*, Microsoft, *Presentation to Emblaze by Microsoft re: U.S. 6,389,473 to Carmel* at 4–6, 9–12 (Aug. 9, 2010) (Sullivan Decl., Ex. B.)

On June 27, 2011, Emblaze's attorneys at Cohen Pontani unilaterally called off the negotiations with Microsoft. Letter from E. Weisz, Cohen Pontani, to K. Sullivan, Microsoft (June 27, 2011) (Sullivan Decl., Ex. E.) Four days later, on July 1, 2011, Cohen Pontani dissolved and nineteen of its attorneys, including Martin Pavane and Edward Weisz, joined Cozen, a firm with a long-existing client relationship with Microsoft that, as described above, continues to this day. *See Cozen O'Connor's New York Office Expands Intellectual Property Practice with Addition of 19 Lawyers from Cohen Pontani Lieberman & Pavane*, http://bit.ly/OFAxdy (Wesenberg Decl., Ex. B.) After that, Microsoft did not hear again from Emblaze or its attorneys for over fifteen months, until, in October 2012, Emblaze filed this action. (Sullivan Decl. ¶ 8.)

**C.    Cozen O'Connor and Davis Wright Tremaine Represent Emblaze in its Suit Against Apple and Have Taken Positions Squarely Adverse to Microsoft's Interests.**

On July 28, 2010, while Microsoft and Emblaze were still corresponding regarding the allegations of infringement of the '473 patent, Emblaze filed suit against Apple in the Southern District of New York. *See* Complaint, *Emblaze v. Apple*, Dkt. No. 1, 5:11-cv-1079-PSG (N.D. Cal.). As in its negotiations with Microsoft, Emblaze was represented in that action by Martin Pavane and Edward Weisz, then of Cohen Pontani. *Id.* On May 10, 2011, after the case was

transferred to the Northern District of California on Apple's motion, Martin Fineman of DWT also appeared for Emblaze. *See Emblaze v. Apple*, Dkt. 35. At that time, Emblaze was still ostensibly negotiating with Microsoft, though it would suspend those talks less than two months later. (Sullivan Decl. ¶¶ 2–7.)

On August 5, 2011, Emblaze filed a Notice of Substitution of Counsel in the *Apple* case, noting that Cohen Pontani had disbanded and that Emblaze would now be represented jointly by Cozen and DWT. *See Emblaze v. Apple*, Dkt. 59. The notice identified Emblaze's counsel going forward as Martin Pavane and Lisa Ferrari of Cozen and Martin Fineman of DWT. *Id.* As described above, both Cozen and DWT represented Microsoft at that time and still do today.

Since joining the *Apple* case, whose schedule is roughly one year ahead of this action, attorneys at Cozen and DWT have knowingly taken legal positions adverse to Microsoft's interests. In pursuing the case against Apple, they have argued for the validity of the '473 patent and of the claims specifically asserted against Microsoft. *See* Emblaze's Opposition to Apple's Motion for Summary Judgment of Invalidity, *Emblaze v. Apple*, Dkt. No. 385 (March 13, 2014). They have proposed claim constructions in that case that in some instances are harmful to both Apple and Microsoft, and in other instances can only be seen as directed at, and harmful only to, Microsoft. *See, e.g.*, Emblaze's Opening Claim Construction Brief, *Emblaze v. Apple*, Dkt. 111 (May 31, 2012).

In particular, Emblaze's counsel at Cozen and DWT have advanced claim construction positions in the *Apple* case that, while seemingly unimportant to that dispute, are highly relevant to Emblaze's case against Microsoft. Emblaze inserted within its proposed construction of the claim term "encoding the slices in a corresponding sequence of files" the clause "wherein a file includes data from a corresponding slice and a file descriptor." *See id.* at 13–15. The particular meaning of the term "file" is not raised by the accused Apple technology, which typically stores a sequence of separate files on the server; instead, the parties' briefing in that case makes clear that the dispute concerning this claim clause was about whether "encoding" requires compression. *See id.* at 15; Apple's Responsive Claim Construction Brief, *Emblaze v. Apple*, Dkt. No. 118, at 14 (July 2, 2012) ("The parties' dispute centers on whether encoding requires compression.").

Yet, as Martin Pavane was well aware from sixteen months of negotiations prior to the filing of this action, the meaning of the term "file" was central to Emblaze's allegations against Microsoft because Microsoft's IIS Smooth Streaming protocol does not divide the multimedia stream into a "sequence of files" but rather stores the entire stream as fragments within a single large file. *See, e.g.*, Microsoft, *Presentation to Emblaze by Microsoft re: U.S. 6,389,473 to Carmel* at 4–6, 9–12 (Aug. 9, 2010) (Sullivan Decl., Ex. B.) The sub-clause inserted by Cozen and DWT attorneys purporting to define "a file" as simply "data from a corresponding slice and a file descriptor" was so unimportant to Apple that it was not discussed in the parties' briefing, *see* Emblaze's Opening Claim Construction Brief, *Emblaze v. Apple*, Dkt. No. 111, at 13–15 (May 31, 2012); Apple's Responsive Claim Construction Brief*, Dkt. No. 118, at 13–16 (July 2, 2012);[1] Emblaze's Reply Claim Construction Brief, Dkt. No. 127, at 7–8 (July 31, 2012), nor in either party's arguments at the claim construction hearing, *see* Transcript of Claim Construction Hearing, *Emblaze v. Apple*, Dkt. No. 181, at 103–118. It was thus adopted with no discussion and only minor modification by Magistrate Judge Grewal. *See* Claim Construction Order, *Emblaze v. Apple*, Dkt. No. 169, at 2 (April 19, 2013).[2]

Both the Cozen firm and DWT have acted, and continue to act, adverse to their client Microsoft. Cozen did not seek a conflict waiver from Microsoft before entering an appearance against Microsoft in this Action, and neither Cozen nor DWT has requested a conflict waiver from Microsoft to represent Emblaze in the related action against Apple. (Fu. Decl. ¶ 3.) At the time of this filing, both Cozen and DWT continue to represent Emblaze in that action.

**D.     In Representing Emblaze against Microsoft, Cohen & Gresser has Substantially Relied Upon the Work of, and Coordinated With, Attorneys at Cozen O'Connor.**

On October 19, 2012, Emblaze filed this action against Microsoft. Compl., Dkt. No. 1. The case involves a competing streaming protocol ("Smooth Streaming") to the one at-issue in

---

[1] Apple briefly addressed the sub-clause in its briefing when arguing that Emblaze's proposed construction was "overbroad and unsupported by the intrinsic record." *Emblaze v. Apple*, Dkt. No. 118, at 15–16 (July 2, 2012).

[2] The Court adopted Emblaze construction with only a single modification — changing "data" to "compressed data." Claim Construction Order, *Emblaze v. Apple*, Dkt. No. 169, at 2. Judge Grewal proposed this modification at the hearing, and Mr. Pavane had no objection. Transcript of Claim Construction Hearing, *Emblaze v. Apple*, Dkt. No. 181, at 105.

the *Apple* case ("HTTP Live Streaming").  *See, e.g.*, Adaptive Streaming Comparison, http://bit.ly/1jtcPPP (Wesenberg Decl., Ex. C.)  Emblaze has asserted the same patent and the same claims against both defendants, including all of the claims originally charted by Edward Weisz and Martin Pavane in their original February 2010 letter to Microsoft.  Letter from E. Weisz, Cohen Pontani, to Microsoft, at A-1–A-4 (Feb. 4, 2010) (Sullivan Decl., Ex. A.)  Yet, despite its involvement both in the *Apple* case and its members' role in spearheading the investigation of and pre-litigation negotiations with Microsoft, Cozen did not originally appear on Emblaze's behalf in this action or make its involvement in the litigation known.  Instead, until December 3, 2013, Emblaze was ostensibly represented in this action solely by Cohen & Gresser and by local counsel Rimon PC, neither of which has a relationship with Microsoft.

It is now apparent that, throughout this litigation, C&G's representation of Emblaze has relied and built upon the work of Cozen attorney Martin Pavane.  Most notably, C&G has proposed for construction only those terms that were construed in the *Apple* case, and it has proposed identical constructions to those adopted by Magistrate Judge Grewal, most of which were either taken verbatim from Cozen's proposed constructions or included critical elements therefrom.  *Compare* Claim Construction Order, *Emblaze v. Apple*, Dkt. No. 169, *with* Emblaze's Opening Claim Construction Brief, *Emblaze v. Apple*, Dkt. No. 111.  In particular, C&G has relied on Judge Grewal's acceptance of Cozen's proposed language to argue that Judge Grewal "implicitly adopted" a broad construction of "file" limited only by the term "descriptor," even though that issue was not before Judge Grewal in that case.  As described above, Emblaze included this language in its proposed construction for the term "encoding the slices in a corresponding sequence of files."  At oral argument, Martin Pavane told Judge Grewal that "[t]he dispute here really goes to the word 'encoding,'" and whether, as Apple contended, "'encoding' must mean 'compressing.'"  Transcript of Claim Construction Hearing, *Emblaze v. Apple*, Dkt. No. 181, at 103.  Judge Grewal's construction included Cozen's proposed phrasing that a file "includes . . . data . . . and a file descriptor," despite Cozen having never explained this language to the Court.  *See Emblaze v. Apple*, Dkt. No. 111, at 13–15 (May 31, 2012); Dkt. No. 127, at 7–8; Dkt. No. 181, at 103–118.  Now, even though the meaning of "file" was not argued in the

*Apple* case and the language was adopted without analysis in a different context, C&G characterizes Judge Grewal's construction not simply as a description of the *contents* of the files used in the invention (i.e., what is "included" in a file) but rather as a definition of what a "file" *is*. *See* Emblaze's Opening Claim Construction Brief, at 6, Dkt. No. 52 (arguing that Judge Grewal "largely implicitly adopted" a definition of "file" to mean "a slice (segment) of data that has a file descriptor"); Emblaze's Reply Claim Construction Brief at 3, Dkt. No. 54 (arguing that Judge Grewal's construction contemplated "a single-file embodiment where a single larger file contains a plurality of files").

Moreover, Microsoft recently learned that C&G has not only relied upon Martin Pavane's pre-trial investigation of Microsoft and his work in the *Apple* case, C&G has also been actively coordinating with Pavane and his team at Cozen throughout the litigation. On December 3, 2013, two weeks before the Claim Construction hearing was scheduled to take place, Martin Pavane formally appeared on behalf of Emblaze ***in this action*** in flagrant violation of his firm's duty of loyalty to Microsoft. *See* Application for Admission of Attorney Pro Hac Vice, Dkt. No. 58. In response, Microsoft investigated the conflict and raised the issue with C&G. (Wesenberg Decl. ¶ 4.) In response, attorney Alexandra Wald at C&G stated that her firm was unaware of Cozen's conflict with Microsoft but conceded that C&G has been communicating and coordinating with Cozen throughout the course of the litigation. (*Id.* ¶ 5–6.) She declined, however, to provide any details about the extent or substance of such coordination. (*Id.* ¶ 5.)

On March 7, 2014, four days after Microsoft raised the conflict issue, Martin Pavane withdrew from this case with no explanation of his conduct. *See* Dkt. No. 63. On April 3, 2014, after several attempts, Microsoft spoke with Mr. Pavane. (Wesenberg Decl. ¶ 10.) He confirmed his current knowledge that Microsoft is a client of Cozen and admitted that he has conferred with attorneys at C&G about Emblaze's case against Microsoft. (*Id.*) Ms. Wald has acknowledged that future communication or coordination with Mr. Pavane would be inappropriate, but, despite admitting past coordination with conflicted counsel, C&G has indicated that it will not voluntarily withdraw from this action. (*Id.* ¶ 7–8.)

Despite agreeing that future coordination with Cozen or DWT would be inappropriate, C&G continues to rely substantially upon their work. For example, on March 31, 2014, several weeks *after* Microsoft raised this conflict, C&G gave notice to Microsoft that it intends to use the same expert with whom Cozen and DWT worked in the *Apple* case — Dr. Vijay Madisetti. (Wesenberg Decl. ¶ 12.) Dr. Madisetti was Emblaze's sole technical expert in the *Apple* case, where he provided two expert reports: a report concerning Emblaze's infringement allegations, dated November 8, 2013; and a report concerning the validity of the '473 patent, dated December 20, 2013. (*Id.* ¶ 11.) Dr. Madisetti was deposed in that case over two days on January 9 and 10, 2014. (*Id.*) Now, C&G has requested that Dr. Madisetti be designated pursuant to the interim protective order in this action to receive and review Microsoft materials designated "Highly Confidential — Attorneys' Eyes Only." (*Id.* ¶ 12.)

### III.     STATEMENT OF LAW

Federal courts in California look to state law to decide motions to disqualify. *TransPerfect Global, Inc. v. MotionPoint Corp.*, 4:10-cv-02590-JCS, 2012 WL 2343908, at *5 (N. D. Cal., June 20, 2012). Attorneys practicing in the Northern District of California are required to adhere to "the standards of professional conduct required of members of the State Bar of California," which are contained in "the State Bar Act, the Rules of Professional Conduct of the State Bar of California and decisions of any court." *Id.* (citing Civ. L.R. 11–4 and comment; *Visa U.S.A., Inc. v. First Data Corp.*, 241 F. Supp. 2d 1100, 1103 (N. D. Cal. 2003)). Although motions to disqualify are disfavored, *see TransPerfect Global*, 2012 WL 2343908, at *6, "[t]he paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar," and, ultimately, "[t]he important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process." *People v. SpeeDee Oil Change Sys. Inc.*, 20 Cal.4th 1135, 1145 (1999).

Under California law, attorneys owe current clients a duty of undivided loyalty. *Flatt v. Superior Court*, 9 Cal.4th 275, 284 (1994). "'It is . . . an attorney's duty to protect his client in every possible way, and it is a violation of that duty for him to assume a position adverse or antagonistic to his client without the latter's free and intelligent consent given after full

knowledge of all the facts and circumstances.'" *Id.* at 289 (*quoting Anderson v. Easton*, 211 Cal. 113 (1930)); *Santa Clara County Counsel Attys. Ass'n v. Woodside*, 7 Cal.4th 525, 548 (1994). "By virtue of this rule an attorney is precluded from assuming any relation which would prevent him from devoting his entire energies to his client's interests." *Id.* This absolute duty of loyalty is critical to sustaining confidence and trust both in individual attorneys and in the overall legal profession and judicial process, *id.* at 285; *SpeeDee Oil Change*, 20 Cal.4th at 1146, so "an attorney must avoid not only the fact, but even the appearance, of representing conflicting interests." *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1387 (2d Cir. 1976) (internal quotation omitted), *cited by Flatt*, 9 Cal.4th at 286–87. This duty is reflected in the California Rules of Professional Conduct. *See, e.g.*, Rule 3-310(C)(3) ("A member shall not, without the informed written consent of each client . . . [r]epresent a client in a matter and at the same time in a separate matter accept as a client a person or entity whose interest in the first matter is adverse to the client in the first matter."). When a law firm "simultaneously represents clients who have conflicting interests, a . . . stringent per se rule of disqualification applies. With few exceptions, disqualification follows automatically, regardless of whether the simultaneous representations have anything in common or present any risk that confidences obtained in one matter would be used in the other." *SpeeDee Oil Change*, 20 Cal.4th at 1147.

A firm violates its duty of loyalty to a client when it takes any action adverse to that client's interest. *See Flatt*, 9 Cal.4th at 289 (holding that the duty of loyalty forbids any act that would, even incrementally, aid in advancing a contemplated lawsuit against a client). This is so even where the substance of the attorney's representation of the client is wholly unrelated to the anticipated harm to the client. *See Flatt*, 9 Cal.4th at 285 ("A client who learns that his or her lawyer is also representing a litigation adversary, even with respect to a matter *wholly unrelated* to the one for which counsel was retained, cannot long be expected to sustain the level of confidence and trust in counsel that is one of the foundations of the professional relationship.") (emphasis in original); *Banning Ranch Conservancy v. Sup.Ct.*, 193 Cal. App. 4th 903, 911 (2011) ("Disqualification . . . is mandatory" "when an attorney simultaneously represents two current clients with conflicting interests" "even though the simultaneous matters may have

nothing in common.").  Similarly, a firm violates its duty of loyalty by taking actions adverse to a

client, even if the offending actions are in the context of a litigation to which that client is not a

party.  *Metro-Goldwyn-Mayer, Inc. v. Tracinda Corp.*, 36 Cal. App. 4th 1832, 1843, (1995) ("The

proscription [against representing clients with conflicting interests] exists where counsel's

employment is 'adverse to the client or former client,' and can exist even though a prior client is

not a party to the litigation.').

Further, an otherwise non-conflicted firm may be disqualified for participating in another

firm's breach of its duty of loyalty.  *See Elantec Semiconductor, Inc. v. Cooper*, 3:98-cv-03871-

CRB, 1999 WL 33921316, *8 (N.D. Cal. Mar. 10, 1999), *citing Fund of Funds, Ltd. v. Arthur

Andersen & Co.*, 567 F.2d 225, 233 (2d Cir. 1977).  When an attorney "work[s] closely" with

another attorney in conduct that violates a duty of loyalty owed to the second attorney's client,

"an appearance of impropriety arises from this close association."  *Fund of Funds*, 567 F.2d at

235.  Therefore, a firm will be disqualified if it aided and abetted another firm's breach of its duty

of undivided loyalty.  *Id.* at 233; *In re Cal. Canners & Growers*, 74 B.R. 336, 347 (Bankr. N.D.

Cal. 1987) ("[A] newly retained attorney may be disqualified for participating in the original

attorney's breach of duty . . . .").

The duty of undivided loyalty is separate and distinct from an attorney's duty of

confidentiality.  *Flatt*, 9 Cal.4th at 284.  Since an attorney's duty of loyalty primarily adheres to

current clients, it arises primarily in situations of *simultaneous* adverse representation.  *Id.*  The

duty of confidentiality, in contrast, survives termination of the attorney-client relationship and

hence can be violated by *successive* representation of clients with adverse interests.  *Id.* at 283.

For cases of successive adverse representation, because the primary concern is the protection of

client secrets, an attorney will only be automatically disqualified if the new matter shares a

"substantial relationship" to the prior matter — unless they are substantially related, the

attorney's knowledge of relevant confidential information will not be presumed.  *Id.*  In cases of

*simultaneous* representation, however, the duty of loyalty demands a more stringent test.  "Even

though the simultaneous representations may have *nothing* in common, and there is *no* risk that

confidences to which counsel is a party in the one case have any relation to the other matter, disqualification may nevertheless be *required*." *Id.* at 284 (emphasis in original).

Critically, disqualification does not require actual wrongdoing on the part of the attorney or firm to be disqualified. *See, e.g.*, *j2 Global Commc'n Inc. v. Captaris Inc.*, 2012 WL 6618272, at *1 (C.D. Cal. Dec. 19, 2012) (disqualifying firm based on co-counsel's failure to identify a conflict despite finding "not a molecule of evidence that [the firm to be disqualified] did anything other than act with integrity and in a manner consistent with the highest traditions of the legal profession."). That is because the purpose of disqualification is not to *punish* attorneys for ethical violations, but rather to prevent or mitigate the *harm* that would result from such violations. *Id.* at *10 ("Motions to disqualify are not about punishing guilty parties. They are primarily about 'preserving the public trust in the scrupulous administration of justice and the integrity of the bar.'"), *quoting Speedee Oil Change*, 20 Cal.4th at 1145; *see also Kirk v. First Am. Title Ins. Co.*, 183 Cal. App. 4th 776, 815 (2010) ("The purpose of a disqualification order is prophylactic, not punitive.").

## IV. ARGUMENT

Before Martin Pavane appeared in this case in December, Emblaze was ostensibly represented against Microsoft only by C&G and local counsel Rimon PC. Since that appearance, however, it has become clear that C&G has in fact been coordinating with Cozen, Microsoft's own counsel, from the start of this litigation and has built its case against Microsoft upon the work of attorneys at the Cozen firm. Whether C&G knew of Cozen's conflict, was deceived by Cozen, or was itself the victim of Cozen's gross negligence in failing to identify this blatant conflict of interest, the result is the same: C&G's case against Microsoft is irreparably tainted. As its counsel, Cozen owed Microsoft an absolute duty of loyalty, and C&G played a central role in Cozen's breach of that duty. Allowing C&G to continue representing Emblaze against Microsoft despite its participation in Cozen's ethical violation — to continue building its case based on advice and work received from Microsoft's own counsel — would make a mockery of the duty of loyalty and aggravate the harm from Cozen's breach.

Although the precise extent of C&G's coordination with Cozen is unknown and could only be ascertained through a review of opposing counsel's privileged communications, Microsoft has presented a prima facie case for disqualification. Unless C&G can rebut this presumption by demonstrating (for example, by allowing the Court to review its communications and records *in camera*) that its coordination with Cozen was insignificant and its case against Microsoft was independently developed, this Court should disqualify C&G from further representing Emblaze in this action.

## A. Martin Pavane and the Cozen O'Connor Firm Have Violated Their Duty of Loyalty to Microsoft by Coordinating with Cohen & Gresser and Taking Actions Directly Adverse to Microsoft's Interest

That Martin Pavane and Cozen have violated their duty of loyalty to Microsoft is beyond dispute. Microsoft is currently a client of Cozen. (Fu Decl. ¶ 1.) From its appearance in December until its hasty withdrawal in March after Microsoft identified the conflict, Cozen was directly and openly participating in a suit against one of its own clients without having sought, much less obtained, a conflict waiver. (*Id.* ¶ 1, 3.) In so doing, Mr. Pavane and Cozen flagrantly violated their duty of undivided loyalty to their client and would have been subject to a *per se* rule of disqualification had they not voluntarily withdrawn. *See SpeeDee Oil Change*, 20 Cal.4th at 1147 ("[I]f an attorney—or more likely a law firm—simultaneously represents clients who have conflicting interests, [it has violated its duty of loyalty], regardless of whether the simultaneous representations have anything in common or present any risk that confidences obtained in one matter would be used in the other."); *Visa U.S.A.*, 241 F. Supp. 2d at 1104 ("When evaluating whether a law firm may concurrently represent two clients, even on unrelated matters, it is presumed that the duty of loyalty has been breached and counsel is automatically disqualified.").

It is now apparent, however, that Cozen's breach of its duty of loyalty to Microsoft went far beyond the few months in which it formally appeared in this case against its own client. Mr. Pavane and his Cozen colleague Ed Weisz were the architects of Emblaze's case against Microsoft and negotiated with Microsoft over 16 months before Emblaze filed suit. (Sullivan Decl. ¶¶ 2–7.) That occurred immediately before Pavane, Weisz, and others from Cohen Pontani joined Cozen in July 2011, (*see* Wesenberg Decl., Ex. B), from which point on they should have

been precluded from taking any actions adverse to their firm's longstanding client Microsoft. Yet C&G and Cozen have conceded that they have communicated throughout the course of this litigation, which has been pending for over 17 months. (*Id.* ¶¶ 5, 10.) Given Pavane's negotiations with Microsoft, his familiarity with Microsoft's defenses, and his extensive experience with the patent-in-suit from the *Apple* case, it is reasonably to assume that these communications were extensive and highly substantive. Regardless, any amount of assistance that would even incrementally aid Emblaze in advancing its lawsuit against Microsoft would be a violation of Cozen's duty of loyalty under California law. *See Flatt*, 9 Cal.4th at 289. Therefore, it is now clear that Cozen has been continually violating its duty of loyalty to Microsoft throughout the entire pendency of this case.

Indeed, it appears that Mr. Pavane and other Cozen attorneys have been actively assisting Emblaze's case against its client Microsoft since before this suit was even filed; for example, by taking actions in the *Apple* case to further Emblaze's claims against Microsoft. The ABA has opined that simultaneous representation of a client in litigation is "directly adverse" to that of another client if "any advantage gained by the lawyer in representation of the litigation client necessarily entails some concrete disadvantage to the [third-party] client . . . ." ABA Formal Opinion 92-367, at 6 (Oct. 16, 1992). In the patent context, courts have similarly disqualified counsel from representing patent holders when "a finding of infringement and an injunction . . . would have a significant practical effect" on one of the counsel's third-party clients, *see, e.g.*, *Rembrandt Technologies, LP v. Comcast Corp.*, 2007 WL 470631, at *4 (E. D. Texas, Feb. 8, 2007) (granting third-party's motion to intervene and to disqualify counsel), although they have found disqualification is unnecessary where the connection between the attorney's work and the harm to its third-party client would be remote or speculative, *see, e.g.*, *id.* ("[T]he mere possibility of overlapping *Markman* proceedings is insufficient to show direct adversity . . . ."); *Enzo Biochem, Inc. v. Applera Corp.*, 468 F. Supp. 2d 359, 367 (D. Conn. Jan. 5, 2007) (declining to disqualify counsel because the positions taken with respect to patent validity would be independent of the specific circumstances of counsel's also-accused third-party client); *Multimedia Patent Trust v. Apple Inc.*, 2011 WL 1636928, at *3–4 (S.D. Cal., Apr. 29, 2011)

(declining to disqualify counsel, finding that that the potential for harm was speculative and that counsel "may not take any position in this litigation that would necessarily be adverse to" its third-party client).

Here, Cozen's actions in the *Apple* case have been directly adverse to Microsoft's interests, and the harm resulting from those actions was neither remote nor speculative. Mr. Pavane has been at Cozen since July 2011 and therefore has, since that time, owed Microsoft a duty of undivided loyalty. Claim construction in the *Apple* case started in January 2012, *see Emblaze v. Apple*, Dkt. No. 68 at 1, and completed in April 2013, *Emblaze v. Apple*, Dkt. No. 169, so the entire process occurred while Microsoft was Cozen's client. Claim construction in the *Apple* case was completed before the parties even exchanged terms in this case, so Mr. Pavane knew that any constructions adopted by Judge Grewal could influence how this Court would construe the claim language as against Microsoft. *Cf. Multimedia Patent Trust*, 2011 WL 163928, at *4 (noting that claim construction in the potentially conflicted case was likely to occur later than in the other case, so it was unlikely that counsel's positions would adversely affect its third-party client). Moreover, having developed Emblaze's case against Microsoft while at Cohen Pontani and having corresponded with Microsoft for sixteen months about its defenses, Mr. Pavane was intimately aware of how Emblaze's proposed constructions would adversely impact Microsoft. Nonetheless, Cozen sought proposed claim constructions in the *Apple* case that were directly adverse to Microsoft interests.

The most significant example of Cozen taking positions in the *Apple* case directly adverse to Microsoft's interests was its proposed construction for the term "encoding the slices in a corresponding sequence of files," in which Cozen included the clause "wherein a file includes data from a corresponding slice and a file descriptor." As Mr. Pavane was well aware, the meaning of the claim term "file" is of central importance to Emblaze's case against Microsoft, because, unlike the claimed invention or Apple's accused protocol, Microsoft's accused Smooth Streaming protocol stores streaming media on the server as fragments within a single large file rather than as a sequence of separate files. (*See* Sullivan Decl. ¶¶ 3, 4, 6.) In contrast, the meaning of the term "file" was not at issue in the *Apple* claim construction process — the dispute

between the parties as to that term was regarding whether "encoding" required "compression." Transcript of Claim Construction Hearing, *Emblaze v. Apple*, Dkt. No. 181, at 103. The term "file descriptor" has no predicate in the intrinsic record, is nowhere mentioned in the patent, and was never explained in Emblaze's briefing or its oral argument to the Court. *See* Emblaze's Opening Claim Construction Brief, *Emblaze v. Apple*, Dkt. No. 111, at 13–15; Emblaze's Reply Claim Construction Brief, Dkt. No. 127, at 7–8; Transcript of Claim Construction Hearing, *Emblaze v. Apple*, Dkt. No. 181, at 103–118. Predictably, since the dispute between the parties was about the meaning of "encoding," Apple's briefing and argument to the Court was silent as to the meaning of Emblaze's proposed "file descriptor." *See* Apple's Responsive Claim Construction Brief, Dkt. No. 118, at 13–16. Given Apple's lack of opposition, it is not surprising that Magistrate Judge Grewal included Emblaze's proposed language in the Court's construction. *Emblaze v. Apple*, Dkt. No. 169. Under the circumstances, and particularly in light of recent revelations that Cozen and C&G have been communicating and coordinating from the start, it seems clear that Martin Pavane and other Cozen attorneys took claim construction positions in the *Apple* case specifically designed to bolster Emblaze's developing case against Microsoft, in direct breach of Cozen's duty of loyalty.[3]

**B.      Cohen & Gresser's Collaboration with Cozen and Reliance on Martin Pavane's Work Aided and Abetted Cozen's Breach of Its Duty of Loyalty to Microsoft.**

C&G's representation of Emblaze against Microsoft is irreparably intertwined with Cozen's breach of its duty of loyalty. C&G has confirmed that it has coordinated and communicated with Cozen throughout the course of this litigation. Given Mr. Pavane's

---

[3] As indicated above, Cozen's local counsel in the *Apple* case is Davis Wright Tremaine ("DWT"), who also represents Microsoft on a wide variety of matters, including both patent litigation cases and matters relating to video streaming. (Fu Decl. ¶ 2.) As a result, DWT owes Microsoft duties of both loyalty and confidentiality. *See Flatt*, 9 Cal.4th at 282–84. C&G claims to have been aware of DWT's conflict with Microsoft and to have avoided any substantive communication with that firm for that reason. (Wesenberg Decl. ¶ 9). Moreover, the extent of DWT's involvement as local counsel in the *Apple* case is, at this time, unknown to Microsoft. As a result, this motion is currently based upon Cozen's violations of its duty of loyalty to Microsoft, which are readily apparent from the record. However, Microsoft notes that additional facts may eventually support disqualifying C&G on alternative grounds, including participation in DWT's breach of its duty of loyalty to Microsoft or a risk of shared Microsoft confidences emanating from DWT. *See Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 233, 235 (2d Cir. 1977).

familiarity with the patent and with Microsoft's defenses, it appears that these communications were substantive and central to the case; indeed, C&G was taking over a case that had been investigated and developed by Mr. Pavane and other attorneys now at Cozen. Moreover, when Cozen violated its duty of loyalty to Microsoft by proposing constructions in the *Apple* case relating to issues tangential to that case but central to this case, C&G built on those breaches of loyalty by arguing to this Court that Magistrate Judge Grewal's constructions be adopted without modification.

The most relevant case on point is the seminal Second Circuit opinion in *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225 (2nd Cir. 1977), where the court disqualified counsel for having "aided and abetted [another counsel's] breach of its duty of undivided loyalty," *id.* at 233, 235–36. In that case, the Morgan Lewis firm was retained as counsel to liquidate the Fund of Funds. *Id.* at 228. As part of the representation, a "squadron of Morgan Lewis attorneys" investigated fraudulent transactions that implicated several parties. *Id.* at 229. One of those parties was John King; another was Arthur Andersen, which Morgan Lewis represented on unrelated matters. *Id.* at 227–29. In an attempt to avoid a conflict, Morgan Lewis made it a policy that no attorney involved in Andersen matters work on the Fund of Funds investigation. *Id.* at 229. Investigators at Morgan Lewis tried to avoid directly "making a case" against its client Andersen — when they came across documents that implicated Andersen, they passed them onto another firm, Borden & Elliot, that was assisting in the investigation. *Id.* In its case against John King, Morgan Lewis brought in local counsel Robert Meister from the Milgrim firm, and he spent over a month reviewing documents and a draft of the King complaint. *Id.* at 230. Later, Borden & Elliot enlisted Meister to prepare an action against Andersen. *Id.* at 231. Morgan Lewis was not officially involved in that action, but Meister used portions of the King complaint in the Andersen complaint and an attorney at Morgan Lewis reviewed the Andersen complaint before filing (though he supposedly made no substantive suggestions). *Id.* The two cases had an expert in common, and the expert's fees were paid jointly by Meister and Morgan Lewis. *Id.* at 232.

The Court in *Fund of Funds* found that Meister "aided and abetted Morgan Lewis's breach of its duty of undivided loyalty to Andersen." *Id.* at 227, 233. The Court found that Morgan Lewis violated its duty of loyalty to Andersen and that Morgan Lewis's lack of formal participation in the case against Andersen was beside the point. *Id.* at 234. "The truism that the firm of Morgan Lewis would have been disqualified from suing Andersen because it was Andersen's counsel, is of little comfort to Andersen which now finds itself embroiled in litigation resulting from Morgan Lewis's extensive investigation . . . ." *Id.* The Court found that Meister was "the extension of Morgan Lewis's continued involvement in the" Andersen case, *id.*, and noted that Meister worked closely with Morgan Lewis in the related King case, which creates "an appearance of impropriety." *Id.* at 235. Accordingly, the Court held that Meister could not continue to represent Fund of Funds in its case against Andersen. *Id.* at 227. Courts in this district have cited *Fund of Funds* favorably and suggested that its holding reflects California law. *See, e.g.*, *Elantec Semiconductor, Inc. v. Cooper*, 3:98-cv-03871-CRB, 1999 WL 33921316 (N.D. Cal. Mar. 10, 1999) ("Under California law, a newly retained 'attorney may be disqualified for participating in the original attorney's breach of duty.'); *In re California Canners & Growers*, 74 B.R. 336, 347 (Bankr. N.D. Cal. 1987) (concluding that "participation in [another attorney's] breach is itself a legally sufficient basis to disqualify" co-counsel).[4]

---

[4] Note that *Funds of Funds* also found a separate ground for disqualifying Meister — he "was so intimately related to the Morgan firm that confidences disclosed by Anderson to Morgan Lewis could have been revealed." 567 F.2d at 233, 235. Many of the cases that have cited *Fund of Funds* involve *successive* rather than *concurrent* representation, and so considerations surrounding the duty of confidentiality rather than the duty of loyalty applied. *Beltran v. Avon Products, Inc.*, 867 F. Supp. 2d 1068, 1078 (C.D. Cal. 2012) ("In a successive representation case with potential conflicts of interest, as here, 'the chief fiduciary value jeopardized is that of client *confidentiality*.'" (emphasis in original)); *see also Canatella v. Krieg, Keller, Reilley & Roman LLP*, 3:11-cv-5535-WHA, 2012 WL 847493 (March 13, 2012); *In re Airport Car Rental Litigation*, 470 F. Supp. 495, 497–98 (April 24, 1979). Those cases have, understandably, focused on whether evidence exists "that the attorney shared any of the client's confidential information with co-counsel. *See, e.g.*, *Canatella*, 2012 WL 847493, at *2. Sharing of confidential information, or the risk of shared confidences, is not required for disqualifying co-counsel when the basis for the original disqualification was a breach of the duty of loyalty — i.e., in cases involving concurrent representation. *See In re California Canners*, 74 B.R. at 347 ("I do not address whether there is a substantial likelihood that McCutchen passed confidential information to Cappello and Casazza. I conclude that participation in McCutchen's breach is itself a legally sufficient basis to disqualify Cappello and Casazza, and I find that those firms did knowingly participate in McCutchen's breach.").

The facts of this case share many critical features with those in *Fund of Funds*. As in *Fund of Funds*, Emblaze's case against Microsoft was investigated and developed by attorneys who, because of a duty of loyalty owed to the party investigated, cannot now formally represent Emblaze in this action. And, as described above, Cozen has built its case against Microsoft relying on Mr. Pavane's initial investigation of Microsoft, on his subsequent communications while an attorney at Cozen, and on Cozen's tactically inspired proposed claim constructions in the *Apple* case. Moreover, even without access to the records of Emblaze's attorneys, it is apparent that the involvement of the conflicted firm is worse than in *Fund of Funds* in at least one respect — Cozen made an appearance in this case directly adverse to its client and withdrew only when caught red-handed. Mr. Pavane's withdrawal in this case does little, if anything, to cure the harm from Cozen's brazen violation of its duty of loyalty to Microsoft. As in *Fund of Funds*, the "truism" that Cozen is not directly participating as counsel for Emblaze in this action "is of little comfort" to Microsoft, "which now finds itself embroiled in litigation resulting from [Mr. Pavane's] extensive investigation" and responding to a coordinated case and claim construction strategy developed by its own counsel Cozen, implemented first by Cozen in the *Apple* case and then re-implemented in the present case by C&G with Cozen's consultation. *See* 567 F.2d at 234. Indeed, even now, fully aware of Cozen's ethical violations, C&G intends to use the same technical expert that Cozen used in the *Apple* case — an expert who presumably worked closely with Cozen attorneys in preparing his two experts reports and in preparing for his two-day-long deposition. (Wesenberg Decl. ¶ 11–12.)

## C. Cohen & Gresser's Knowledge of Cozen's Conflict, or Lack Thereof, Does Not Affect the Disqualification Analysis

C&G has claimed that it was not aware of Cozen's duty of loyalty to Microsoft and has suggested that it cannot be disqualified for unknowingly participating in another's ethical violation (Wesenberg Decl. ¶ 6). If C&G did not, in fact, know of Cozen's conflict, that might be relevant to some abstract apportioning of blame; however, disqualification under the ethical rules is not designed to *punish blameworthy conduct*, but rather to *prevent and mitigate the harm* that results from breaches of an attorney's duties. *Kirk*, 183 Cal. App. 4th at 815 ("The purpose of a

disqualification order is prophylactic, not punitive."); *j2 Global*, 2012 WL 6618272, at *10 ("Motions to disqualify are not about punishing guilty parties. They are primarily about 'preserving the public trust in the scrupulous administration of justice and the integrity of the bar.'"), *quoting Speedee Oil Change*, 20 Cal.4th at 1145. The harms from participating in a breach of another's duty of loyalty are real, regardless of whether or not the participant was aware of the underlying conflict. When disqualifying counsel who knowingly assisted in ethical violations, courts have understandably emphasized that fact, *see, e.g.*, *Fund of Funds*, 567 F.2d at 234 n.18; *Cal. Canners*, 74 B.R. at 348–49, but knowledge is not a requirement for disqualification, *see, e.g.*, *j2 Global*, 2012 WL 6618272, *10 (disqualifying firm based on co-counsel's "inexplicable decision" to assign a conflicted attorney to the case, despite finding that none of the attorneys at the firm to be disqualified had knowledge of the co-counsel's conflict).

This is unsurprising, as requiring proof that the firm to be disqualified *knowingly* participated in an ethical violation would create an insuperable obstacle for moving parties and engender perverse incentives. It would be difficult, if not impossible, to conclusively demonstrate such knowledge without having access to privileged communications. It would also encourage conflicted firms to withhold disclosing conflicts to their co-counsel or, even worse, to forgo checking for conflicts in the first place.

Most important, the harm to Microsoft is the same whether C&G knew of Cozen's conflict, whether Cozen withheld that information from C&G, or whether the conflict was not identified as a result of Cozen's gross negligence in failing to perform a conflicts check. Whatever C&G knew, Microsoft now finds itself embroiled in litigation resulting in substantial part from its own counsel's actions and work product. *Cf. Fund of Funds*, 567 F.2d at 234. Disqualifying C&G is necessary not to punish that firm, but rather to mitigate the harm from Cozen's flagrant ethical violation — C&G's knowledge of the conflict, or lack thereof, is irrelevant.

**D. The Available Record Establishes that C&G Should Be Disqualified Unless It Can Demonstrate that Its Communications with Cozen Were so Insubstantial that Its Continued Representation Would Not Be Tainted by Cozen's Ethical Violations**

C&G has conceded communication and coordination with Cozen throughout this litigation, and Cozen has confirmed the same. (Wesenberg Decl. ¶¶ 5, 10). However, the extent, scope, and substance of such coordination is unknown and could only be discovered through a review of those firms' privileged communications and billing records. Such privileged information is, obviously, not available to Microsoft.

In similar circumstances, where the decision to disqualify might turn on the degree and substance of privileged communications, courts have adopted a burden-shifting framework: A party seeking disqualification must first demonstrate that there were substantive conversations between disqualified counsel and co-counsel, at which point a rebuttable presumption of disqualification of co-counsel arises. At that point, the burden shifts to the party resisting disqualification to demonstrate that the substance of the privileged communications does not merit disqualification. *See In re American Home Products Corp.*, 985 S.W.2d 68, 81 (Tex. 1998). The Court in *American Home Products* succinctly described the rationale for such an approach:

> We share the concern . . . that re-imputation of knowledge could lead to an unending and unwarranted string of disqualifications. At the same time, we are mindful of the concerns . . . regarding the inability of a client in many situations to prove that its confidences were actually revealed. We conclude that the proper balance is to place a burden of producing evidence of non-disclosure on the party resisting disqualification once the requisite showing has been made by a party seeking disqualification.

*Id.* (internal citations omitted). *American Home Products* involved a potential breach of the duty of confidentiality rather than the duty of loyalty, but the same reasoning applies. In a case involving confidentiality, the relevant information is whether confidences were likely shared, *see id.*; *Funds of Funds*, 567 F.2d at 236, whereas in a case involving loyalty, the relevant information is whether co-counsel substantially participated in the breach, *see Fund of Funds*, 567 F.2d at 234; *In re Cal. Canners*, 74 B.R. at 348. In either case, the information relevant to disqualification is only known to the party resisting disqualification, so burden shifting is appropriate. *See American Home Products*, 985 S.W.2d at 81; *Gonzalez v. Central Elec. Co-op, Inc.*, 2009 WL 3415235, at *1–2 (D. Or. Oct. 15, 2009).

Here, Microsoft has more than met its initial burden and made a prima facie case that C&G substantially participated in Cozen's breach of its duty of loyalty. C&G and Cozen have admitted that they have coordinated and communicated throughout Emblaze's action against Microsoft, and yet they have refused to provide further information regarding the extent or substance of such communications. (Wesenberg Decl. ¶¶ 5, 10.) C&G claims that both firms were unaware of the conflict, suggesting that they felt free to coordinate and made no attempt to limit such communications. (*Id.* ¶ 6.) Given Martin Pavane's experience with the patent from his lead role in the *Apple* case and his familiarity with Microsoft's defenses from his pre-litigation negotiations, there is every indication that his coordination with C&G was substantial. Finally, Mr. Pavane's formal appearance in this action shortly before the then-scheduled Claim Construction hearing further suggests that his already substantial role in the case against Microsoft was growing.

In light of this evidence, C&G should be disqualified unless Emblaze can rebut the presumption by demonstrating that its communications and coordination with Cozen were so insubstantial that its continued representation of Emblaze against Microsoft would not be tainted by Cozen's breach of its duty of loyalty. To the extent that such proof would require an analysis of privileged communications, the Court could review such materials *in camera*. As in *American Home Products*, such an approach appropriately balances Microsoft's right to protect and enforce the duty of loyalty owed it against Emblaze's right to attorney-client privileged communication.

## E.  Disqualification of C&G is the Only Suitable and Appropriate Remedy

Unless C&G can rebut the presumption that it substantially participated in Cozen's breach of its duty of loyalty to Microsoft, the only appropriate remedy is disqualification. Microsoft now finds itself the target of litigation whose architect was its own counsel. Cozen attorney Martin Pavane, who originally developed the case against Microsoft before handing it off to C&G, has secretly assisted C&G throughout this case and taken tactical positions in the *Apple* case designed to bolster Emblaze's case against Microsoft. C&G cannot unlearn the contents of its improper communications with Cozen nor forget the advice that it received from Mr. Pavane. C&G's own work on the case cannot be neatly severed from its participation in Cozen's ethical violations. In

short, C&G cannot continue to represent Emblaze in this action without perpetuating and aggravating Cozen's breach of its duty of loyalty.

No remedy short of disqualification would redress the harm to Microsoft. In particular, ordering C&G simply to refrain from future coordination with Cozen and DWT would do nothing to address the ethical violations that have already occurred. Whether or not C&G coordinates with conflicted Microsoft counsel moving forward, the fact remains the same: Microsoft will be facing litigation based substantially upon the advice and work product of its own counsel working with its adversary. Every future action that C&G takes will be tainted by its communications with Cozen. Only by disqualifying C&G and requiring Emblaze to move forward with counsel free of the taint of Cozen's violations can the action maintain the public's trust and confidence and avoid the appearance of impropriety that the duty of loyalty is designed to protect. *See Flatt*, 9 Cal.4th at 285.

Emblaze may protest that finding new counsel would create cost for Emblaze, but cost to Emblaze is not a basis to let ethical breaches go unremedied and undeterred. Microsoft is not to blame for this situation, and everyone is entitled to a fair and ethical legal system. "Ultimately, [all] disqualification motions involve a conflict between the clients' right to counsel of their choice and the need to maintain ethical standards of professional responsibility." *SpeeDee Oil Change*, 20 Cal. 4th at 1145 (1999). Faced with this dilemma, "[t]he paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar. The important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process." *Id.*

### V.    CONCLUSION

Since the filing of this suit over seventeen months ago, C&G has actively and substantially participated in Cozen's breach of its duty of loyalty to Microsoft. C&G's continued participation in this action would perpetuate and aggravate Cozen's ethical violation. Accordingly, C&G should be disqualified from further representing Emblaze in this action, and any future counsel for Emblaze in this action should be prohibited from communicating with Cozen or DWT in any manner.

1    DATED:  April 4, 2014                    **PERKINS COIE** LLP

2                                             By: _/s/ Eric L. Wesenberg_
                                                 Eric L. Wesenberg
3
                                             *Counsel for Defendant*
4                                            Microsoft Corporation

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2014, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the CM/EMF registrants for this case.

_/s/ Eric L. Wesenberg_